## STATE v. REIDELL.

*Homicide—Murder—Insanity—Proof—Experts—Doubt.*

To make a deliberate killing, done with a deadly weapon prepared for the purpose, murder in the first degree, the prisoner must have been capable of knowing, at the time, but his act was a wrongful one, and have not the power or control over his will to prevent his doing it.

The burden of proof is upon the defendant to show insanity, or inability to control his actions.

In questions of sanity or insanity, proof made by expert witnesses is of much greater value than that of persons who have no scientific or experimental knowledge of the subject of insanity, and who can only speak from observation of outward signs or appearances.

Upon an indictment for the murder of his wife, if the harmonious relations existing at all times between the prisoner and his wife, together with the testimony of experts that the prisoner had, at the time of the homicide, the disease of melancholia, impairing his will power, and likely to be manifested in such an act as he committed, and the fact that he exhibited no remorse, but, rather, calm satisfaction, raises a reasonable doubt of the prisoner's sanity, which the testimony of witnesses of his appearance and conduct does not remove, the jury should acquit.

That the prisoner has asserted, since his arrest, that he was perfectly sane at the time he did the deed, is not conclusive, as it is a common delusion of insane persons to believe themselves sane.

(*New Castle, May 18, 1888.*)

INDICTMENT for murder.

*John Biggs,* Attorney General, for the State.

*H. H. Ward,* for defendant.

COMEGYS, C. J., charging jury :

The indictment against the prisoner at the bar charges him with the crime of murder of the first degree; the victim being his own wife. It is necessary that you should know precisely what

murder of the first degree is. Murder is the malicious killing of one human being by another. This is the general definition of that crime, which is the highest known to the law, except treason. There are, by our statute law, two degrees of murder, viz., murder of the first and murder of the second degree. The first is punishable with death ; the second, with imprisonment for life. The first is called a capital felony. All murders were formerly punished by the death penalty; but now murder of the first degree is only so punished. This is by a legislative provision,—an act of assembly. As this case, as alleged in the indictment, is a case of the first character, or murder of the first degree, and is that crime or nothing at all, it is important that you should be fully informed of its nature and qualities. The statute provides as follows: " Every person who shall commit the crime of murder with express malice aforethought, or in perpetrating or attempting to perpetrate any crime punishable with death, shall be deemed guilty of murder of the first degree and of felony, and shall suffer death." To make, therefore, a homicide murder of the first degree, it is necessary that it be a killing with express malice aforethought. To understand this, you must be told, in the first place, what is meant by malice aforethought, or preconceived malice. " This is not so properly spite or malevolence to the deceased in particular as any evil design in general,—the dictate of a wicked, depraved,. and malignant heart." " Express malice is when one, with a sedate, deliberate mind,— formed design,—doth kill another, which formed design is evidenced by external circumstances discovering that inward intention; as lying in wait, antecedent menaces, former grudges, and concerted schemes to do him some bodily harm." Every killing by one person of another is presumed to be malicious, and murder, unless it can be justified ·or excused, or reduced to the crime of manslaughter, by reason of circumstances applying to those descriptions of homicide, respectively. It is not necessary to explain such homicides; for this we are concerned with is not one of them. In fact, as I have said already, it is murder of the first degree or noth-

ing; for the killing was deliberately done, and with a deadly weapon, prepared for the purpose. As the victim was the prisoner's own wife, the crime is one of peculiar atrocity, if, as contended by the attorney general, it was the act of "a person of sound memory and discretion;" but not a crime at all if, as contended by the prisoner's counsel, it was not the act of such a person. There is no controversy whatever in relation to the act of killing, or anything else necessary to show that, *prima facie*, upon the State's testimony, murder of the first degree was committed by the prisoner; but his counsel contends that, upon the proof he has brought forward and exhibited to you by his witness, such prisoner was not, at the time of the commission of the fatal act, "a person of sound memory and discretion." In other words, he contends that the prisoner was, to an extent and in a respect sufficient to make a complete defense to the charge against him, insane at the time the act was committed. It is sufficient for me to say to you that if, in fact, the prisoner was insane when he fired the fatal shot against his wife's life, then he is not responsible, in the eye of the law, for the act done. The question for you to decide, then, is this: Was the prisoner capable of knowing, at the time he slew his wife, that his act was a wrongful one, and had he the power or control over his will to prevent him from doing it? This is the test as laid down by the court of oyer and terminer of this State in the case of *John Windsor*, tried for murder, in the fall of 1851, in the county of Sussex. The question is not, simply, whether one who kills another, was capable, at the time, of distinguishing or knowing the differences between right and wrong with reference to his fatal act, but also whether he was then capable of controlling himself from the commission of it. Where there is no compelling cause, as in the case of manslaughter, which provokes the act of homicide by overpowering the reason of the actor, all those who know right from wrong, in regard to a contemplated homicide act, are to be presumed and taken to have control of their actions by the exercise of their will. There is no supposition in favor of one not being

able to control his own actions; and where, upon an indictment for any act of personal violence, he sets up, or there is set up for him, the plea of inability to do so, the burden of proof is upon him to show such inability. This, I submit to you, can only be done, in a case similar to this, by proving insanity; that is, disease of that moral faculty or element of a man's spiritual nature, which impairs what is familiarly called his will power, or ability to control his actions. It seems, at first view, very unreasonable to suppose that one who is capable of knowing right from wrong should not be entirely able to decide between them if he choose to do so; but it is a well-known truth that such capacity of knowledge may be perfect enough in an individual, and yet he may be unable, from destruction, or impairment by disease, of that function of the brain which is concerned with the will, to avoid doing what he knows to be wrong. Take an example. Men who are addicted to drink, from excessive indulgence become subjects of a disease which medical men designate or speak of as dypsomania or alcoholism. It oftentimes develops into what is called by them *mania a potu,* wherein the patient becomes a madman, wholly deprived of all sane reason while the fit is upon him. In that condition, he is not legally responsible for his actions, being treated as insane. As the disease has created for him, in his imagination, a totally new existence, the reason which before controlled his conduct no longer exists, but a new and perverted one has taken its place. The will power which attended it has gone with the reason itself. So it is in the case of the mere hard drinker, who, a victim of the disease of dypsomania, loses control of his will with respect to restraint of his thirst for liquor; and though he may be perfectly sane, and have complete control over himself generally, yet from his disease, or passion for drink, and the momentary relief indulgence of it gives his morbid feelings of despondency, he has entirely lost control of himself with respect to such indulgence, and drink he must and will in spite of his reason, his past experience, and the warnings his physician and friends give him. He drinks, not because

of desire to taste stimulants, but that his disease demands of him that he get relief at any hazard. Another: There is a disease called scientifically kleptomania, that is, the disease of stealing. Persons who are victims of it will steal in spite of all restraints. They may be sane in mind in all other respects, may know perfectly well that stealing is wrong every way, and may have no occasion to steal whatever, not being in want, or having prospect of it, and yet steal they will, at the risk of the terrible exposure detection produces. In both these examples, (and others might be given,) the diseases are of that character which undermines and overthrows the will; rendering their respective victims powerless to control their conduct with respect to their temptation, though they possess their will, in its entire vigor, in all other things. In one, as in the other, there is no lack of the reasoning power as to the rightfulness or wrongfulness of their conduct or behavior; and yet the power—the ability—to do otherwise than what they do, is wanting. No enlightened criminal system of law punishes them for acts which, if the will was in a healthy state, would never be done, any more than it does the mere idiot, or person who never had any reason at all.

According to the testimony of the learned gentlemen,—medical experts, as we call them.—there is a certain disease of the mind, and I may say affections, called melancholia, which sometimes operates upon the power of will. Its victim, like those in the examples before given, may be entirely sound of mind in all other respects; and yet, with the knowledge of right and wrong which attends such soundness, may be unable to control his will, or resist the prompting of his disease to do what, in one having full possession of that faculty, would be not only a wrongful, but an atrociously wicked act. All of those gentlemen speak unhesitatingly about the nature of this disease. One of them, in particular, Dr. Mills, is what is known as an alienist, or person who has made mental diseases, those affecting the mind intellectually, and the moral or spiritual faculties, his special study. The others are ex-

perimental experts; *two* of whom, Drs. Brush and Ogle, have had extensive experience of cases of insanity. The other, Dr. Springer, is the physician of your county almshouse, where many insane receive treatment at his hands. All of them said, in effect, in their testimony, that, in their judgment, the prisoner at the bar was a subject of the disease of melancholia, which disease they described to you, and that the dreadful act committed by him was the result of that disease, and not of reason or will; that in fact he was insane at the time of the tragedy, so far as his power to control his action with respect to it was concerned. The reason they gave for their opinion was, the despondency of mind of the prisoner on account of the discharge of his wife from the factory where they were employed, as he conceived, most unjustly; the experienced difficulty of securing permanent employment before their engagement there, which preyed upon his spirits; the defeat of his expectations to free himself from debt if permitted to continue their engagement to the time of the expiring of their notice to leave; and other manifestations not necessary to be repeated. To rebut this testimony the State produced but one expert, Dr. Stewart, who has had no experience with cases of insanity except in the course of his general practice as a physician, and with cases of melancholia only three times. He saw the prisoner in the jail at New Castle, and heard all the testimony of the prisoner's witnesses, including that of the professional witnesses; and gave his opinion, from what he had seen in his practice, and what he had heard from the witness stand, that the prisoner was not insane at the time he killed his wife, and that any such appearance of an unhealthy mental state as his acts and manner exhibited since he shot himself on that eventful Saturday early morning was owing to the wound he gave himself on the same occasion. The attorney general, however, produced many witnesses who had before been examined upon other points, and others, also, who spoke to their never having noticed anything, before the time of the homicide, which indicated that the prisoner was not, at all times when under their ob-

servation, (and the factory witnesses saw him every day when he worked there,) of perfectly sound mind. They, however, were not in any sense experts, as they themselves stated. Now, in passing upon the testimony of witnesses whose statements are conflicting, the general rule is that credit should be given where there is the greater weight of evidence. In determining the question where the weight, is, the jury, in cases of this kind, requiring special knowledge in witnesses, should consider (where, for example, the witnesses on both sides are equally intelligent) which class of them have had the best opportunity for making observations and forming correct judgments,—that is, the most experience; whether they speak from positive knowledge gained in their practice or employment, or negatively, as not having observed what those on the other side affirm from their actual experience and observation; for positive testimony as to a fact is always of more value, coming from a credible witness, than that of a negative character. And suggestions like these are always of great service where an equal number of trustworthy witnesses depose, on the opposite sides, to directly opposite facts. I do not mean, by any means, to say, or have you for a moment entertain the idea, that any one is to be convicted of crime upon the mere weight of testimony, unless it is sufficient to prevent the entertainment by the jury of any doubt upon the whole testimony, of the prisoner's guilt,—not suspicion of guilt, but certainly of it; for, as I shall explain hereafter, a very humane rule prevails, especially where a human life depends upon the verdict to be rendered by the jury. Many people, I may say most people, suppose that insanity cannot exist without the signs of it appearing from time to time. This is not, by any means, an unreasonable supposition, where it is expected, as it is by many, that the suspected one will be guilty, at almost any time, of making some foolish speech or doing some foolish thing; whereas, there are said to be forms of insanity—and this of melancholia one of them—where the impairment of that part of the moral or spiritual system which relates to the will is never shown until the occasion arises to test

the existence of the disease which causes it. We see a defect in the mere physical being or structure at once ; but in the intellectual or moral structure, or seat of perceptiveness or moral affections, we can perceive nothing at any time except such outward manifestations as produce activity in that structure, or some part of it. This organism is that part of the animal system called the brain, with different functions or offices, as physiologists, or students of that system, inform us ; and which all intelligent persons believe, as a part of human knowledge. A malady or disease of a part of that system, the experts in this case tell us, may lurk in it undeveloped until some occasion occurs which evokes its exercise. Then, they tell us, it, in many cases, overpowers the will, or power to resist its demands, and the subject of it gives way to them because he cannot help doing so. An effort of the will alone could save him from doing what he may know perfectly well to be wrong, and yet that effort the disease which possesses his moral structure prevents him from making. The will is too weak to resist the influence of the disease,—just as the will of the drunkard, or dypsomaniac, is too weak to enable him to subdue his depraved appetite for strong drink, He yields to the desire simply because he cannot help it. The thief. with the disease of kleptomania, is in like case. He knows thieving is wrong, but the temptation to fraudulently take and appropriate to his own use another person's property is too strong for his will power to resist. This exposition of the law of insanity, such as is claimed to exist here, is just the same in its nature as that laid down by the court of oyer and terminer at Georgetown, *Windsor's Case;* or, speaking more strictly, the court, through the mouth of Judge Harrington, gave, as a test of criminal responsibility, the " ability " of a person " to distinguish between right and wrong in reference to the act itself, (that is, the act done by him,) and the power to choose whether he will do it or not." The true test, therefore, is not, as sometimes laid down, the capacity merely to distinguish between the rightfulness and wrongfulness of the act committed, but also sufficient will power to choose whether he shall

do or refrain from doing it. After referring to many cases upon the same subject, the learned judge proceded to say : " We do not perceive that there is any very great difference in all these cases; the aim of all seeming to be to define a state of mind in which the prisoner is capable of the perception or consciousness of right and wrong as applied to the act he is about to commit, and has the ability, through that consciousness, to choose, by an effort of the will, whether he will do the deed which he knows to be wrong." In his report of the case, the words I have quoted are italicized by him to show the approval of the court of the definition of " sanity," which, as I have before said, is knowledge of the rightfulness or wrongfulness of the contemplated action,—the power to decide against doing the wrongful deed. I think I have said enough upon this topic, although the whole case turns upon it.

In the commencement of my remarks to you, I stated, generally, what the crime of murder was, and then quoted from the statute what murder of the first degree is. There can be no murder without malice, and that of the first degree must be characterized by express malice aforethought. I also stated, or gave you to understand, that the elements of crime of murder of first degree existed here, *prima facia ;* that premeditated slaying, as shown here was express malice in legal contemplation. It follows from this that the prisoñer is to be taken to be guilty as indicted unless he has shown you by his proof that, at the time of the act done, he was not of sound mind. In other words, he must show to your minds, in order to repel the conclusion of guilt as resulting from his act, or the malice of it, that he had no such power or control over his conduct as to prevent him from doing it. The maliciousness of the act is an inference to be drawn from the deliberateness of it, which must be overcome, or at least made uncertain, in order to save him from a verdict of guilty. If the testimony of his expert witnesses, and the other facts shown, have satisfied your minds that, at the time the act was committed, he was laboring under a disease which controlled his will, and rendered him powerless to avoid him doing

it, then the fact of his consciousness that it was a wicked and wrong-
ful act goes for nothing; for he was not the master of his own
actions, any more than if he had never had any control of them.
This is the necessary conclusion to be arrived at. The question is,
has he done so? In deciding it, you should take into consideration
all the facts and circumstances, and all the testimony of the wit-
nesses, on both sides, always bearing in mind that, in questions of
sanity or insanity, the proof made by expert witnesses—men who
have devoted their time and attention to cases of mental derange-
ment—is of much greater value than of other persons who have no
scientific or experimental knowledge of the subject of insanity, and
who can only speak from observation of outward signs or appear-
ances; whereas, as the defendant's expert witnesses have told
us, such signs or appearances are not always evidence until
some act is done which no sane man would commit. In such
consideration, two prominent facts, proved in this case, are
not to be overlooked, but are to be weighed in your minds
carefully, and given such significance as your judgment may
think they are entitled to. These facts are, the kind and
affectionate relations existing at all times, by the uncontradicted
testimony, between the prisoner and his wife and family. I do not
think a more certain case of harmonious conjugal relations, of free-
dom from unhappiness between man and wife, could well be shown.
Nor has dissipation, in any form, been shown or suggested in the
prisoner's case. Apparently, he was a very well-disposed man and
husband, with whom, or whose conduct in the latter character, there
had never been any cause of complaint. You may be sure, if any
ground to consider him otherwise had existed, it would have been
shown on the part of the state; for a crime so cruel and inhuman
as the killing by the prisoner would seem to require some explana-
tion of motive beyond that he himself assigned. Still that is a
matter for you. It is for you to say whether a good and affectionate
husband, which it has been shown by the proof this man was,
would, in his right senses, deliberately send his innocent wife and

child to their last account because he thought they would be better off, and then try to take his own life.   In deciding upon this point, you must be governed by your experience of life.   Do men, in their right reason, deliberately put an end to those who are nearest and dearest to them, under the plea that they would be better off when they are quite as well off, in point of contentment and happiness, (we are warranted by the proof in saying,) as the average of human families?   It is for you to answer this out of your own observation and experience in connection with the facts proven in this case. The law holds every man against whom there is proof of the commission of crime to have been sane of mind at the time he did it. This presumption, however, is not a conclusive one, but may be successfully rebutted by proof, provided it be satisfactory to a jury. If it be sufficiently so as to create in their minds a well-founded, reasonable doubt upon the point of sanity at the time the act was done, the prisoner is to be given the benefit of it; for the law humanely holds every man to be innocent until shown by adequate proof to be guilty, at the same time that it presumes him to have been sane at the time of a deed of wickedness done.   Sanity must appear to the satisfaction of the jury, for it is a requisite of the mind; but no actual proof of it need be made by the State, because of the presumption, until the accused has given evidence to the contrary, which raises, in the minds of the jury, a reasonable doubt of the conclusiveness of such presumption.   As I have said, the legal presumption may be rebutted by proof.   What is meant by it is not that the presumption of sanity shall prevail, whether or no,—else no man's life would be safe in most trials,—but that it dispenses, in the first instance, with what would otherwise be necessary,—actual proof thereof.   But it is no greater or higher than sufficient *prima facie* proof, and may be overthrown or weakened and made doubtful, as actual proof may be.   When it is made doubtful by a countervailing proof of facts or circumstances, the doubt, in a criminal case, is not to be resolved by what is called the superior weight of the state's testimony merely; but such testimony

must be of so convincing a character as, upon consideration by the jury, removes the doubts altogether. Not until all reasonable doubts of the criminality of the prisoner are removed, after a calm, deliberate, impartial, and unbiased consideration of all the facts and circumstances shown in proof both for and against him, can a jury properly render a verdict of guilty. In this case, if the state of the harmonious relations existing at all times between the prisoner and his wife, with the superadded testimony of the scientific experts, including Drs. Ogle and Springer, that the prisoner had, at the time of the homicide, the disease of melancholia, likely to be manifested by the commission of just such an act as the prisoner did perpetrate, and also the other facts, that he made no attempt to do what the common course of guilty criminals attempt,—escape from justice,—and subsequently (when sufficient consciousness returned after the infliction of an intended deadly wound upon himself) the absence, not only of all remorse for his fatal act, but apparent calm satisfaction with respect to it,—have raised in the minds of the jury reasonable doubts of the prisoner's accountability for his act, which the presumption of sanity I have spoken of, with the proof by witnesses who spoke on the part of the State with respect to his appearance and conduct while under their observation, has not removed, then it is not a case for conviction, but of not guilty by reason of insanity. And with respect to the testimony of the deputy-sheriff, that the prisoner asserted to him in November last his displeasure at the postponment of his trial, and declaration of his entire sanity at the time the act was done, this is not by any means the first case where a prisoner indicted for a crime has asserted his sanity at the time he did it. A common feature of the delusions of persons is to believe themselves, in all their actions, perfectly sane, and more so than others about them. Their delusions are to them as much reality, in their diseased imaginations, as the facts of life and appearances of external nature are to the most sensible of us.

To sum up in regard to your decision of this case: If, upon

all the presumptions of law and proof in this case, your minds should be free from all reasonable doubt of the prisoner's entire accountability for the crime which he is shown to have committed, you ought to render a verdict of guilty in manner and form as he stands indicted; but, if you have such reasonable doubt, then you must give him the benefit of it, and find him not guilty by reason of insanity.

Verdict, murder in the first degree.

———————————•———————————

NOTE FROM ATLANTIC REPORTER.

INSANITY AS A DEFENSE TO CRIME—TEST OF. The legal test of responsibility for crime is the mental capacity of the criminal, at the time of the commission of the offense, to discriminate between right and wrong with respect to the particular act charged to have been committed. *U. S. v. Young*, 25 Fed. Rep., 710; *U. S. v. Ridgeway*, 31 Fed. Rep., 144; *Hart v. State*, (Neb.) 16 N. W. Rep., 905; *State v. Nixon*, (Kan.) 4 Pac. Rep., 159; *State v. Murray*, (Or.) 5 Pac. Rep., 55; *State v. Pagels*, (Mo.) 4 S. W. Rep., 931; *Leache v. State*, (Tex.) 3 S. W. Rep., 539; *People v. Kernaghan*, (Cal.) 14 Pac. Rep., 566; *Hawe v. State*, (Neb.) 10 N. W. Rep., 452; *State v. Mowry*, (Kan.) 15 Pac. Rep., 282. In California, moral insanity, as distinguished from mental insanity, constitutes no excuse for a crime. *People v. Kerrigan*, (Cal,) 14 Pac. Rep., 849; *People v. Kernaghan*, Id., 566. So it is held in *State v. Pagels*, *supra*, that it is no defense to a crime, that the accused obeyed an uncontrollable impulse, springing from an insane delusion. See, also, *Leache v. State*, *supra*, for a discussion of the doctrine of moral insanity and uncontrollable impulse. In *Dacey v. People*, (Ill.) 6 N. E. Rep., 165, it is held that the insanity which will relieve of accountability for crime must be of such a character as to create an uncontrollable impulse to do the act charged, by overriding the reason and judgment of the criminal. Where partial insanity is relied on as a defense, it must appear that the crime was the product of the delusion or other morbid condition, and connected with it as effect with cause. *Guiteau's Case*, 10 Fed. Rep., 161; *State v. Hockett*, (Iowa,) 30 N. W. Rep., 742. Mere mental weakness, the subject being of sound mind, is not insanity. *Wartena v. State*, (Ind.) 5 N. E. Rep., 20. Nor is mental unsoundness, which is not the result of a disease, but is caused by allowing the passions to run until they have become uncontrollable. *People v. Durfee*, (Mich.)

29 N. W. Rep., 109. But the presence of intelligence is not an absolute test of sanity. *Bennett v. State*, (Wis.) 14 N. W. Rep., 912. And it is held in *Parsons v. State*, (Ala.) 2 South. Rep., 854, in opposition to, or qualification of, the doctrine "of the right or wrong test" laid down in the cases above cited, that, if the criminal has the capacity to distinguish between right and wrong with respect to the particular act charged, but, by reason of the duress of mental disease, has so far lost the power to choose between the right and wrong that his free agency is at the time destroyed, and the alleged crime is so connected with such mental disease as to be the product of it solely, then such criminal is not responsible. Insanity produced by protracted over-indulgence in intoxicating liquors may be held to be an excuse for a crime. *People v. Blake*, (Cal.) 4 Pac. Rep., 1; *Territory v. Davis*, (Ariz.) 10 Pac. Rep., 359.

SAME—BURDEN OF PROOF. Where the plea of insanity is interposed to a criminal prosecution, the burden of proof is on the defendant to establish such defense. *Farris v. Com.*, (Ky.) 1 S. W. Rep., 729; *State v. Pagels*, (Mo.) 4 S. W. Rep., 931; *U. S. v. Ridgeway*, 31 Fed. Rep., 144; *Massengale v. State*, (Tex.) 6 S. W. Rep., 35. Where an insane person has lucid intervals, the law will presume that an offense committed by such person was committed in a lucid interval. *Leache v. State*, (Tex.) 3 S. W. Rep., 539. In general epilepsy, the usual presumption of responsibility attaches to acts committed in the intervals between one attack and another. *State v. George*, (Iowa,) 18 N. W. Rep., 298. Upon the question of what proof is necessary to overcome the presumption of sanity, three different views are entertained by the courts. It is held that such presumption may be overcome by evidence tending to prove insanity sufficient to raise a reasonable doubt of sanity at the time of the offense. *Dacey v. People*, (Ill.) 6 N. E. Rep., 165. So, also, that if there is some evidence tending to rebut the legal presumption of sanity, the burden of proof is changed to the State to show sanity beyond a reasonable doubt. *Ballard v. State*, (Neb.) 28 N. W. Rep., 271. On the other hand, it is held that a reasonable doubt of sanity, raised by all the evidence, will not justify an acquittal, but that the defense must be sustained by a preponderance of evidence. *Parsons v. State*, (Ala.) 2 South. Rep., 854; *People v. Kernaghan*, (Cal.) 14 Pac. Rep., 566. While, under the statutes of Oregon, if the commission of the crime is proven, the defense of insanity must be sustained by proof which satisfies beyond a reasonable doubt. *State v. Murray*, (Or.) 5 Pac. Rep., 55.

Insanity cannot be proven by reputation. *Walker v. State*, (Ind.) 1 N. E. Rep., 856. Circumstantial evidence, which reasonably satisfies of the existence of insanity, is sufficient. *State v. Pagels*, (Mo.) 4 S. W. Rep., 931.