## STATE vs. CHARLES W. JACK.

*Criminal Law—Assault with Intent to Commit Murder—Evidence in Rebuttal—Insanity—Defense—Burden of showing Insanity—Character of Insanity—Hallucinations, etc.—Condition caused by Cocaine, Intoxicants, etc.*

1. In a trial for assault with intent to commit murder, where the defense is insanity, any conversation bearing upon the question of insanity and not detailed by the prosecuting witness in his examination in chief, is admissible in rebuttal to the defense of insanity, but it must be confined to that.

2. Where insanity of a permanent character is once established by the evidence it is presumed to continue until the contrary is proven satisfactorily; but if the insanity be of a temporary character, no such presumption arises.

3. To exempt a person from responsibility for crime, the insanity must be of such a character as either to deprive him of the capacity to distinguish between right and wrong in respect to the particular act committed, or to deprive him of sufficient will power to choose whether he would do the act or refrain from it. .

4. So long as a person has capacity to distinguish between right and wrong in the particular act, and has will power to do it, or not to do it, he will be held criminally responsible; even though the mind is subject to hallucinations, melancholy, exhilaration, or is otherwise affected from the use of cocaine, intoxicants, or any other cause.

5. Insanity being a matter of defense, the burden of showing it is upon the defendant. It must be proved as a fact to the satisfaction of the jury. If the proof does not arise out of the evidence offered by the State, the defendant must so establish it by distinct evidence. Evidence tending to show the absence of motive may be considered by the jury in determining the question of the insanity of the accused.

(*November 27, 1903.*)

LORE, C. J., and SPRUANCE and GRUBB, J. J., sitting.

*Herbert H. Ward,* Attorney-General and *Robert H. Richards,* Deputy Attorney-General, for the State.

*Andrew C. Gray* and *John F. Neary* for the defendant.

Court of General Sessions, New Castle County, November Term, 1903.

INDICTMENT FOR ASSAULT WITH INTENT TO COMMIT MURDER.

At the trial, Doctor James R. Mahaffy, a veterinary physician, the prosecuting witness, who was assaulted by the defendant on the thirteenth of October, 1903, testified in substance concerning the assault, as follows:

That the defendant called upon him on the day of the assault, at his office No. 904 Jackson Street, in the City of Wilmington, and stated that he had a friend out at Blue Ball who had two horses hurt and asked if the doctor would go out to see them, stating that he had been at the office in the morning and was informed that the doctor was out but that he would be in about one o'clock, and that he had therefore come back for him.

Mahaffy informed the defendant that he would be ready to go with him in about one-half or three-quarters of an hour and asked him where the place was located where his services were wanted. That Jack, the defendant, told him to "go out the Concord Pike, turn to your right at the blacksmith shop at Blue Ball, and then turn out the cross-roads." That Jack then stated that if the doctor would go right away and come right back, he would go out with him, to which the doctor assented. That Jack then went with the doctor to the latter's hospital where he was treating some horses, and when that work was finished they both got in the doctor's buggy and drove down Washington Street, and out across Washington Street Bridge to the Concord Pike; Jack directing the doctor (after turning to the right at the blacksmith shop at Blue Ball) as to the road to the place where the alleged horses were sick, viz., one Mr. Miller's. After making several turns they passed a certain farm-house and the defendant said, "It is the next farm down here"; that they came to that farm and he then said, "I did not mean this one, I meant the next one on the left." That the

doctor started to drive to the next farm on the left and Jack said, "Wait a moment, I am a little mixed on this myself," and started to get out of the buggy, but seeing some men working in a field near the road he called to them and asked where Mr. Miller lived, and they said, "The next farm on your right." Witness then continued:

"I could see the next farm further down on the right and I remarked about such a long greenhouse that was back of the house, and Jack said, 'Yes, they are mainly truck farmers.' We went on until we were almost to the gate, as I thought that I saw a gate, he pointed with his left hand, and said, 'Here is where you turn in,' and I did not see any place there where I could turn in and I leaned a little bit forward and down to see what he meant, and my recollection is that he was indicating where we could turn down to go into the greenhouses, not the regular road, and I leaned a little bit forward to see, then the crash came and I felt as though somebody had run into us from behind and as if something had hit me in the back of the head. I remember dropping the lines and my face almost touching the dashboard. Then the second shot came and I felt a stinging sensation here on the top of my head and the thought flashed through my mind that he was shooting. And I straightened up, turned around a little and put my left arm around his neck, and as I did so I looked right into the muzzle of the revolver; I pushed the revolver and gripped it and twisted it out of his hand. When the third shot went off, it struck the mare on the spine or the side of the hip bone, and she started to run, and by that time I had taken the revolver away from him and the mare had run into the ditch and stopped, and as I had my arm around his neck and the revolver in my hand, he slipped his head from under my arm and jumped out and started to run down the road and I got out of the wagon and tried to fire the revolver at him but by that time my finger was feeling numb and the arm felt like your foot does when it is asleep, and it just dropped. I remember his turning around as I lifted the revolver up and he started to

take his coat off as he was running, and then he ran into the ditch ; the last I can remember is of his running towards the side of the road into the ditch. I walked a little ways back along the road and called and a man and a woman came out and said, 'What is the matter?' and I said 'somebody has shot me,' and he said, 'You are sure you did not shoot yourself?' and I said, 'yes; what did I want to shoot myself for?' and said I wanted someone to take me to Wilmington with my team, and they said 'You cannot go with your team, your horse has been shot', and the lady took me in the house and bound up my neck; then the man hitched up a team and drove me to town. As we were going in there was so much blood coming down on this left side that I imagined the bullet had punctured the jugular vein, and I remember holding my finger up to it to try to stop it and I remember the warm blood running down my finger. The ambulance met us somewhere at the Blue Ball and took me to my home."

The doctor's injuries were a wound made by a bullet which entered the neck and came out behind the ear, and another one on the top of the head toward the left.

There was no denial of the actual commission of the crime by the defendant, but the defense set up was insanity by reason of certain injuries received by the defendant, and also of the excessive use of cocaine, and the evidence offered on the part of the defendant tended to show that he had used cocaine for some months prior to the assault, and that as a result thereof, he was subject to hallucinations and did many acts immediately preceding the assault tending to show that he was temporarily insane.

When the defendant had rested, Dr. Mahaffy was recalled by the State, in rebuttal, and was asked by the Attorney-General, the following question :

"You have already testified of the trip into the country and of the attack upon you. Will you give us in detail the conversation you had with the defendant during that ride (not going into the conversation you have detailed in your former examination), giving the topics of the conversation, and what he said ?"

(Objected to by counsel for the defendant as not in reply and as improper in rebuttal, being part of the case in chief, and part of a conversation which the witness had already testified to and which he could not supplement at this stage of the case. The Attorney-General contended that the testimony sought to be elicited by the question was strictly in rebuttal to the defense of insanity which could not have been anticipated by the State when putting in its case in chief.)

LORE, C. J.:—A majority of the Court hold that any conversation bearing upon the question of insanity and not detailed by the witness in his examination in chief, is admissible at this stage of the case, in rebuttal to the defense of insanity, but it must be confined to that.

GRUBB, J., concurred.

SPRUANCE, J., dissented.

LORE, C. J., charging the jury:

Gentlemen of the jury:—Charles W. Jack, the defendant, is charged in this indictment with an assault on James R. Mahaffy with intent to commit murder, alleged to have been made on the thirteenth of October, 1903.

In order to convict of the crime as charged in the indictment, it is incumbent on the State to prove to your satisfaction, beyond a reasonable doubt, that the defendant not only made an assault upon Mahaffy, but that such assault was made with the intent to kill and murder him. The distinctive features of the crime being (1) the assault, (2) the intent to commit murder.

An assault, is an unlawful attempt to do violence to the person of another with the present means of carrying the intent into effect.

Murder is the unlawful killing of a reasonable creature in being, with malice aforethought either express or implied.

Malice is the test of murder. In a legal sense it is the dictate of a wicked, depraved or malignant heart, and of a disposition to do evil.

Bearing in mind the definition of the elements of the crime charged, you are to determine from the evidence whether the crime charged has been committed by the defendant.

The defense set up in this case is insanity. It is claimed that some four years ago the defendant was injured in his head in a game of foot ball, which occasioned concussion of the brain and occasional fainting spells; that for some time prior to the alleged assault the defendant had also been addicted to the excessive use of cocaine; that from these causes his mind was so affected that at the time of the alleged assault he was insane, that is, so demented as not to be criminally responsible for his actions. This, if true, is a complete defense, and you should acquit him. The law regards a person in such mental condition incapable of committing crime.

Insanity may be either total or partial in its character. It may be either permanent or temporary in duration.

Where insanity of a permanent character is once established by the evidence, it is presumed to continue until the contrary is proven satisfactorily; but if the insanity be of a temporary character, no such presumption arises.

To exempt a person from responsibility for crime, the insanity must be of such a character as either to deprive him of the capacity to distinguish between right and wrong in respect to the particular act committed, or to deprive him of sufficient will power to choose whether he would do the act or refrain from it.

So long as a person has capacity to distinguish between the right and wrong in the particular act, and has will power to do it or not to do it, he will be held criminally responsible; even though the mind is subject to hallucinations, melancholy, exhilaration, or is otherwise affected from the use of cocaine, intoxicants or any other cause.

In considering the defense of insanity, you must direct your

attention to the time of the alleged assault particularly; for while much testimony has been admitted as to the mental condition of the defendant both before and after that time, it was admitted only with the view to throw light upon that precise time and event. If he was sane at the time of the alleged assault, he is responsible; it matters not what may have been his condition at any other time or place.

Every person is presumed to be sane until the contrary is proved to the satisfaction of the jury.

Insanity being a matter of defense, the burden of showing it is upon the defendant. It must be proved as a fact to the satisfaction of the jury. If the proof does not arise out of the evidence offered by the State, the defendant must so establish it by distinct evidence. Evidence tending to show the absence of motive may be considered by you in determining the question of the insanity of the accused, if any such evidence there be.

Should you be satisfied from the evidence that at the time of the alleged assault the defendant was insane, as we have heretofore defined it, you should acquit him on the ground of insanity, and so return your verdict. If, on the other hand, you find that he was then sane, and that he made the assault with intent to commit murder, you should find him guilty.

Upon a careful and conscientious consideration of all the evidence, if you entertain a reasonable doubt as to the guilt of the defendant, such doubt should enure to his acquittal. It must, however, be a reasonable doubt growing out of the evidence, and such as your judgment and conscience compel you to entertain.

Verdict, guilty.