CHANIE RUFFIN, Appellant, v. THE STATE OF DELAWARE, Appellee.

84

(*June* 13, 1956.)

SOUTHERLAND, C. J., and WOLCOTT and BRAMHALL, J. J., sitting.

*Henry A. Wise, Jr.,* for appellant.

*Richard J. Baker* and *Frank O'Donnell, Jr.,* Deputy Attorneys-General, for the State.

Supreme Court of the State of Delaware, No. 1, 1956.

BRAMHALL, J.:

The appellant, Chanie Ruffin, was indicted and tried for murder of the first degree of one Clarence B. Tilden. The jury found appellant guilty of murder of the second degree. Appellant appealed.

The substantial facts, which come largely from the statement and testimony of appellant herself, are not in dispute. They are as follows:

On the morning of the 20th day of February, 1954, appellant appeared at a firehouse in the City of Wilmington, in a highly excited and somewhat hysterical condition. She informed a fireman stationed there that she had just shot a man. The police were immediately notified and appellant was promptly taken into custody.

Appellant lived by herself in a rented room in the City of Wilmington. For several years she had received visits from deceased, with whom she was intimate. In the early morning of the day in question deceased came to the room of appellant with another man. Deceased, by threatening appellant with a gun, compelled her to have sexual intercourse with the other man. He later (apparently after the other man had left) compelled her to submit to unnatural sexual relations and indignities with him. Deceased then lay down on the bed to rest. Appellant left

the room to empty a slop bucket. She returned and dressed. Deceased told appellant that he was not asleep, that if she left the room he would kill her. Appellant took a pistol lying in the bureau drawer and shot deceased, who was still lying on the bed. Deceased jumped up and reached for appellant, telling her "I am going to get you for this". Appellant then shot deceased four more times. One of the bullets entered the brain of deceased and in the opinion of the examining physician caused instant death.

The numerous errors alleged by appellant relate principally to the statement given by appellant to police; admissibility of evidence showing the reputation of deceased for violence; and alleged errors in the charge of the court below.

### 1. Exculpatory Statements

The State's case against the defendant in chief was based on statements, admittedly voluntary, made by defendant to police officers. Defendant claims that these statements were not incriminating but exculpatory and completely rebutted any presumption of unlawful homicide.

It is true that appellant appeared to contend, from some of the statements made, that her act was committed in self defense. She claimed that she was in great fear of deceased. She had been compelled by deceased to have sexual intercourse with another man and unnatural and inhuman relations with deceased prior to the shooting. According to her statement, she had also been subjected to other indignities by deceased in the past. She knew of acts of cruelty committed by deceased upon others. No evidence was offered specifically contradicting appellant's exculpatory statements.

But the facts stated by appellant do not necessarily make out a case of self-defense. Indeed, it is at least questionable whether the appellant under the facts of this case was entitled to have the issue of self-defense given to the jury. While the acts of deceased were of the most repulsive and sadistic nature, this

treatment had ceased for some time prior to the shooting. Appellant had even left the room with the slop bucket. She returned and dressed. At the time deceased was lying on the bed "dozing". Unquestionably, she had an opportunity when she first went out of the room and, perhaps, after she had returned and dressed, to remove herself from the presence of the deceased and the possibility of his carrying out any further acts of violence upon her.

The homicide was committed by appellant by the use of a deadly weapon. In the absence of circumstances justifying such action this alone would make appellant guilty of the crime of second degree murder. The burden was upon her to justify her act. *Brown v. State*, 9 *Terry* 427, 105 *A*. 2d 646; *State v. Stevenson*, 8 *W. W. Harr.* 105, 188 *A*. 750. The lower court saw fit to submit the question of self-defense to the jury under a proper charge and the jury found appellant guilty of murder of the second degree. On the basis of the statement the verdict was justified.

## 2. Implied Malice

Appellant objects to the charge of the court below relating to implied malice. The language of which appellant complains is as follows:

"Implied malice must be shown by the character of the fatal attack and the surrounding circumstances. Where there is proved no facts or circumstances indicating a sedate and deliberate mind and formed design or intention to kill or do great bodily harm, yet where the fatal act was unlawful and cruel and voluntarily committed without adequate provocation and in circumstances showing a wicked indifference to human life, or with a reckless disregard of the consequences, the law implies malice."

Appellant's objection goes to the statement in this portion of the charge to the effect that no deliberation is necessary in murder of the second degree. She contends that the use of this language was tantamount to an instruction to the jury to the

effect that appellant could be found guilty of murder in the second degree without proof that the murder was committed with a sedate and deliberate mind and formed design to kill or do great bodily harm. Appellant asserts that this is not a correct statement of the law.

The instruction was correct. Implied malice does not require a sedate and deliberate mind and formed design to kill or to do great bodily harm. This has been so often held by our courts that any discussion seems superfluous. Appellant's argument is based on the discussion of express and implied malice in the case of *Bantum v. State*, 7 *Terry* 487, 85 *A.* 2d 741, 750, in which we said:

"The use of the concept of express malice to distinguish between the degrees of murder was not based upon any difference in the degrees of guilt; it was adopted because it constituted a device for tempering the severity of administering capital punishment in all cases of murder. *State v. Buchanan, Houst. Cr. Cas.* 79; *State v. Till, Houst. Cr. Cas.* 233."

As will appear from an examination of the cited cases, the division of murder into degrees by our statute in no way blurred the distinction between express and implied malice. Appellant, apparently, seeks to suggest that the *Bantum* case had the effect of changing the law and requiring proof of deliberate mind and formed design to constitute implied malice. This is wholly erroneous. The charge as given was correct.

3. Refusal Of Court To Charge Upon Temporary Insanity

Appellant objects to the refusal of the court below to charge the jury upon temporary insanity. In the statement of appellant introduced in evidence by the State, appellant stated that as a result of the inhuman and barbarous treatment of her by deceased, she had reached "the blowing point and she couldn't stand it any more * * *". There was also evidence that after the shooting appellant was excited and perhaps hysterical. However, there was no evidence of any kind indicating mental derangement.

 It has been shown by the State that appellant killed deceased with a deadly weapon. There is a presumption that appellant knew the consequences of her act and that she was sane at the time of its commission. The burden was therefore upon her to prove the contrary. *State v. Pratt, Houst. Cr. Cas.* 249; *State v. Reidell,* 9 *Houst.* 470, 14 *A.* 550; *State v. Lee,* 1 *Boyce* 18, 74 *A.* 4; *State v. Hand,* 1 *Marv.* 545, 41 *A.* 192; *State v. Jack,* 4 *Penn.* 470, 58 *A.* 833; *State v. Cole,* 2 *Penn.* 344, 45 *A.* 391; *State v. West,* 1 *Houst. Cr. Cas.* 371, 399. No testimony was offered by appellant or on her behalf tending to show insanity on her part at the time of the homicide.

 The most that can be said for appelant's contention is that the treatment which she had received at the hands of deceased had caused her to go into an emotional frenzy. It is true that a few hours before the commission of the homicide appellant had been raped, had been forced to permit unnatural intercourse with deceased, and had been threatened with a revolver. Unquestionably, such inhuman acts were sufficient to cause her to become highly excitable and hysterical. But a frenzy introduced by mere passion or other overwhelming emotion not growing out of a mental disease does not, of itself, constitute insanity. *State v. Reidell, supra; Guetig v. State,* 66 *Ind.* 94, 32 *Am. Rep.* 99. See 14 *Am. Jur.,* "*Criminal Law*", Sec. 35, p. 793; 40 *C. J. S., Homicide,* § 4, note 96, p. 829. The court below was correct in its refusal of appellant's request for a charge on insanity.

### 4. Express Malice

Appellant objected to the inclusion in the charge of the court below of certain examples of express malice, such as lying in wait, ill will, spite or jealously, as to some of which appellant contends there was no evidence in the record.

 It was clearly stated in the charge that these illustrations were purely examples. The language used has been followed in this state since the passage of the Act of 1852 defining murder as of two degrees. Our courts originally lifted this lan-

guage almost bodily from *Blackstone's Commentaries on English Common Law*. However, since the portion of the charge objected to related to murder of the first degree and since appellant was acquitted of that charge, any error committed by the court below, if it can be said that there was an error, in this portion of the charge was cured by the acquittal. *Powell v. State*, 7 *Terry* 551, 86 *A.* 2d 371; *Brown v. State, supra.*

### 5. Proof Of Specific Instances Relating To The Commission Of Other Crimes Of Violence Committed By Deceased

Appellant attempted to justify the shooting of deceased on the ground of self-defense. In support of her testimony in that respect, she was permitted to show that deceased was a violent man, that he had attempted to hang his wife. She was also allowed to introduce in evidence the criminal record of deceased, with which she was familiar. The purpose of this testimony was to show the violent nature of deceased; it was not otherwise connected in any manner with the crime of which appellant was charged. Appellant, however, was not permitted to introduce in evidence the details of the specific offenses referred to.

Unquestionably, appellant had a right to show the reputation of deceased, known to her, for violence, because of its effect on the mind of appellant at the time of the shooting, in order to determine whether or not she was in reasonable fear of harm at the hands of deceased. *State v. Wiggins*, 7 *Penn.* 127, 76 *A.* 632. In the case of *State v. Gordon*, 7 *W. W. Harr.* (37 *Del.*) 219, 181 *A.* 361, 362, former Chief Justice Layton, in permitting defendant to introduce specific instances showing the reputation of deceased for violence, said:

"* * * and there seems to be no substantial reason why the belief of the prisoner should not be evidenced by knowledge of specific acts of violence, as well as by knowledge of general reputation for violence, subject, of course, to exclusion in a proper case for remoteness."

See *State v. Short*, 2 *Boyce* 491, 82 *A.* 239.

██ But there must be a limit to the admission of such testimony. To allow a defendant to put into evidence the details of numerous acts of violence in order to show a deceased's reputation for violence would permit the introduction into the trial of collateral issues and would in some cases undoubtedly delay the trial of the case for an interminable length of time. We think that appellant was not entitled to prove the details of the specific instances to which she was permitted to refer in her testimony.

██ As for the record of the conviction of the deceased for violating the age of consent law, it is clear that the crime charged did not constitute an act of violence of the nature referred to here and would not have been helpful in showing the reputation of deceased for acts of violence.

6. Was It Error For The Court Below To Charge The Jury That They Might Accept The Parts Of A Statement Of Accused Which Incriminated Her And Disregard Those Parts In Her Favor?

Appellant excepted to the charge of the court below to the effect that the jury might accept the part of her statement incriminating appellant and reject the part in her favor if under all the evidence they saw sufficient reason to do so. She contends that since the State's case was based entirely upon the statement of appellant admitting the shooting and since in that statement there was testimony of an exculpatory nature which the State did not attempt to refute or contradict, the State is bound by the exculpatory statements. In this respect the court charged the jury as follows:

"The whole of what the accused said on the subject at the time of making the statement should be taken together. The jury may believe that part which criminates the accused and reject that which is in his favor, or credit so much as is in his favor and discard that which is against him, if they see sufficient reason, upon all the evidence, for so doing, for the jury are at

liberty to judge of it, like any other evidence, from all the proven circumstances of the case."

Appellant argues that by this language the court below charged the jury that they might reject all parts of the statement favorable to appellant, even if uncontradicted. This is not correct. The charge authorized the jury to disregard such testimony *provided they had sufficient reason under the evidence for doing so*. Certainly the jury in determining the weight to be given to this statement were bound to consider the circumstances under which the statement was given, the fact that it was a self-serving declaration, and the probability of the exculpatory statements being true.

The law is well settled in this State, and in most other jurisdictions, that the accused is entitled to have a statement admitted in its entirety, including any exculpatory or self-serving declarations connected therewith. *Lowber v. State*, 6 *Boyce* 353, 100 *A.* 322, 2 *A. L. R.* 1014; *State v. Tilghman*, 6 *Penn.* 54, 63 *A.* 772. See also cases collected in *Annotation*, 2 *A. L. R.* 1017. However, the jury may believe or disbelieve such portion thereof as they may be warranted under all the evidence in doing. *State v. Tilghman, supra.* In the *Tilghman* case the defendant was the only eyewitness to the shooting. She gave a statement to the effect that in an argument with deceased she told the deceased she was going to leave, took her hat off the table and started out the door; that the deceased grabbed a gun, pulled back the trigger and pointed the gun at defendant; that defendant shoved the barrel of the gun upwards and the gun fired; that she did not see the gun fall as it was dark. There was some testimony, unexplained by defendant, to the effect that the gun was later found upon the mantel in the room. However, no evidence was offered to contradict defendant's statement. Nevertheless, the court charged the jury in practically the same language as in the case on appeal. Here the exculpatory part of appellant's statement is contradicted by the fact that immediately prior to the shooting deceased was lying on the bed "dozing",

and that appellant had been out of the room prior to the shooting and immediately prior thereto was dressed.

We think that the jury were entitled to determine, if they chose to do so, under all the evidence to disbelieve the exculpatory part of appellant's statement.

### 7. Was It Error To Permit The Alternate Jurors To Mingle With The Jury During The Trial?

Appellant takes exception to the ruling of the court below, permitting, over appellant's objection, the alternate jurors to mingle with the regular jurors, both in and out of the jury room, prior to the submission of the case to the jury. At the time the case was submitted to the jury, the alternate jurors were discharged and took no part in the deliberations of the jury.

The appointment by the court of alternate jurors is provided for under Rule 24(c) of the Rules of Criminal Procedure of the Superior Court, *Del. C. Ann.*, which reads as follows:

"Alternate Jurors. The court may direct that not more than 4 jurors in addition to the regular jury be called and impannelled to sit as alternate jurors. Alternate jurors in the order in which they are called shall replace jurors who, prior to the time the jury retires to consider its verdict, become unable or disqualified to perform their duties. Alternate jurors shall be drawn in the same manner, shall have the same qualifications, shall be subject to the same examination and challenges, shall take the same oath and shall have the same functions, powers, facilities and privileges as the regular jurors. An alternate juror who does not replace a regular juror shall be discharged after the jury retires to consider its verdict. Each side is entitled to 1 peremptory challenge in addition to those otherwise allowed by law if 1 or 2 alternate jurors are to be impanelled, and 2 peremptory challenges if 3 or 4 alternate jurors are to be impanelled. The additional peremptory challenges may be used against an alternate juror only, and the other peremptory challenges allowed by these rules may not be used against an alternate juror."

It will be noted that the Rule provides that an alternate juror who does not replace a regular juror shall be discharged after the jury retires to consider its verdict. With the exception of the general provision that alternate jurors "shall have the same functions, powers, facilities and privileges as the regular jurors", the Rule is otherwise silent as to the status of alternate jurors.

In our opinion there has been no violation of any constitutional right of appellant. While it is true that the alternate jurors were kept with the regular jurors during the trial, they were not present when the evidence was concluded and the jury retired for its deliberations. As this case was a capital case, the regular jury was not allowed to separate. We think that under the provisions of Rule 24(c), the alternate jurors should likewise have been kept together. The fact that prior to the retirement of the jury for deliberation the alternate jurors were kept with the regular jurors under the supervision of the bailiffs of the Superior Court is not important unless there is a showing of some improper act as a result thereof. There is no contention here that the alternate jurors were guilty of any improper actions.

Appellant has cited two cases: *People v. Bruneman*, 4 *Cal. App.* 2d 5, 40 *P.* 2d 891, and *People v. Britton, Cal. App.*, 45 *P.* 2d 368. These cases are of no help to appellant, since the act complained of in each was the presence of the alternate jurors in the jury room with the regular jury during its deliberations.

We do not think that any constitutional right of appellant has been violated or that she has been prejudiced in any manner by the mingling of the alternate jurors with the regular jury during the trial and prior to the deliberations of the regular jury.

### 8. Was The Jury Properly Polled?

Appellant objected to the method used in polling the jury. This method consisted of the clerk taking the verdict from the

foreman and then saying to each individual juror: "You have heard the verdict of your foreman—Is that your verdict?" Each juror replied that it was.

The method of polling a jury as above indicated has been followed in this state for so many years that it is a practice not lightly to be discarded in the absence of clear proof of the violation of some fundamental right of appellant.

The purpose of polling a jury is to determine whether or not there is a concurrence on the part of each individual juror with the verdict announced by the foreman. It is clear from the answer of each juror that he or she agrees with the verdict announced by the foreman, in the absence of statute there is no reason why any particular method of polling a jury must be followed. Here, the form used was the one followed in this state for many years. It was clear from the answer of each juror that he or she agreed with the verdict as announced by the foreman.

Appellant cites two New Jersey cases to demonstrate what she contends to be the proper method of polling the jury, namely: after the foreman has announced the verdict, by having each juror rise and state the verdict explicitly. Unquestionably such procedure would undoubtedly be a proper one. However, both the cases cited by appellant are excellent examples of how a juror, unfamiliar in the use of legal phraseology, may become confused when this method is followed. In the case of *State v. Myers,* 7 *N. J.* 465, 81 *A.* 2d 710, 25 *A. L. R.* 2d 1171, the Supreme Court of the State of New Jersey specifically approved a polling of the jury where the clerk after repeating the verdict of the foreman to each juror, asked him if that was his verdict.

We see no merit in appellant's contention.

We find no error in the record. The judgment of the Superior Court is affirmed.