Alexander G. BRINKLEY, Defendant Below, Appellant,

v.

The STATE of Delaware, Plaintiff Below, Appellee.

Supreme Court of Delaware.

July 27, 1967.

James F. Kipp and Francis J. Trzuskowski, Asst. Public Defenders, for appellant.

Jay H. Conner and F. L. Peter Stone, Deputy Attys. Gen., for the State.

WOLCOTT, C. J., and CAREY and HERRMANN, JJ., sitting.

CAREY, Justice.

Appellant, Alexander G. Brinkley, was convicted in Superior Court of murder in the second degree. He has appealed from the sentence imposed thereon. He contends that (1) the evidence was legally insufficient to support the conviction; (2) the trial Judge improperly commented upon the evidence; and (3) certain remarks of the prosecuting attorney in summation were improper and prejudicial.

The appellant lived in a room with the victim, Evelyn Jordon, in the home of Mr. and Mrs. Elwood Ray in Wilmington. On April 20th, 1966, appellant and the victim had gone to their room. Later, appellant came down and told Mrs. Ray to call the police because he had shot Evelyn. An officer came to the house and was met at the door by appellant, who told the officer he had shot his girl friend. Other officers arrived and went to the bedroom where they found the victim lying back across the bed. She was dead.

An autopsy showed that a bullet had entered her right eye. Four bullet fragments were found in the brain tissue. There were no powder burns on the body. The doctor who performed the autopsy gave the opinion that the bullet had ricocheted off the posterior portion of the skull. He agreed that the bullet was a large one of high velocity and that its fragmentation could have resulted from striking the bones of the skull. He stated that the bullet had entered almost directly horizontally with a slight upward tilt. A police officer found a .38 calibre revolver, loaded except for two spent cartridges, in the chimney flue in the basement of the house. Appellant admitted to the officer that it was his gun.

On appellant's behalf, Mr. Ray testified that he had owned the iron bed in appellant's room for a long time; and that there was a hole in the left leg at the foot of the bed which he had never seen until defense counsel pointed it out to him about the time the trial began, some five months after the killing. Pictures of the bed showing the hole were introduced into evidence.

Appellant himself testified that he and the victim had been arguing before the shooting. She was taunting him by saying she had been out with another man. He admitted firing the gun twice, his purpose being to frighten but not to kill her. The first shot was fired over her head when he was about six feet from her. It apparently went out the window. The second shot was fired from a position near the foot of the bed. He said that it was fired downward; that, at the moment, the victim was sitting on the side of the bed leaning over; and that after the shot she fell back across the bed. The room measures 13 feet 8 inches by 13 feet 7 inches. The bed occupies much of the floor space, being 6 feet 9 inches wide.

In rebuttal, an investigating officer testified that he saw no hole in the bed at the time of the investigation.

## I

■ Appellant's main contention is that the evidence was insufficient to support the verdict. His argument is this: the State admittedly showed a death caused by appellant's intentional use of the revolver. This proof raised a presumption of malice which would justify a verdict of second degree murder unless rebutted. Bantum v. State, 7 Terry 487, 85 A.2d 741. Appellant's evidence showed an accidental killing which did rebut that presumption. It cannot be correctly said that the circumstantial evidence is inconsistent with any rational conclusion other than guilt. It follows, says he, that his motion for acquittal of murder should have been granted, because the evidence as a whole demonstrated a reasonable hypothesis inconsistent with guilt.

■ To support this contention, appellant argues the probability that the bullet hit the bed leg and ricocheted to the victim's eye. This hypothesis, he argues, is fortified by the fact that he must have been standing only a few feet from her and by the likelihood that a bullet of high velocity would have passed completely through her skull had it not been slowed down by hitting something else before entering her eye. One answer to this contention is obvious. When the State made out a prima facie showing of implied malice, it became incumbent upon appellant to show circumstances of justification, excuse or mitigation by the preponderance of the evidence or to the satisfaction of the jury. Quillen v. State, 10 Terry 114, 110 A.2d 445. We know of no law which required the Judge or the jury to believe all of appellant's evidence or his theoretical reconstruction of events.

■ But, even if his testimony and inferences be accepted, he was not entitled to a judgment of acquittal entered by the Court as a matter of law. The trial Judge's charge to the jury included a paragraph substantially the same as the one approved by this Court in Ruffin v. State, 11 Terry 83, 123 A.2d 461. The language used in the present case was this:

"Murder in the second degree, therefore, occurs when a killing is done, without premeditation or deliberate mind required to make the act murder in the first degree, but where it is done without justification or excuse, and without adequate provocation, and when it was done with a wicked and depraved heart, or with a cruel and wicked indifference to human life. In a case of that kind, the law implies malice and renders it incumbent upon the accused to show by evidence that the killing was not in fact malicious, or that there were circumstances of mitigation, extenuation, justification or excuse".

Here were a man and woman in a little room less than 200 square feet in area. He could not have been more than six or eight feet away from her. He fired two shots from a high-powered revolver, not aimed directly at her, yet pointed in her general direction. He must have known that bullets ricochet in unpredictable directions upon hitting hard substances. In this setting, despite the lack of an actual intention to hit her, his intentional acts were so fraught with danger to her—so likely to cause death or great bodily harm—as to clearly justify a jury in finding a "cruel and wicked indifference to human life", and that his explanation did not constitute "mitigation, extenuation, justification or excuse".

We find no error in the refusal to order an acquittal.

## II

■ The remark of the trial Judge which appellant now questions was made after the jury had been deliberating for several hours. It sent a note to the Court asking that the Reporter read back that part of the testimony "in which the word 'ricocheted' was first mentioned". After a conference with counsel, the Judge called the jury into the court room and denied the request. In explaining the reasons therefor to the jury, the Judge said, inter alia, "There is also a

difficulty in connection with reading the testimony where the word 'ricochet' is first mentioned because the attorneys and I had trouble * * * remembering whether that word was ever mentioned in the testimony or whether it was first mentioned in the summation. There was, of course, testimony which a jury might evaluate that has a bearing upon possible ricochet * * *". Appellant argues that this remark may have given the jury the impression that defense counsel made up the idea of ricochet without substantiation in the evidence. We find no merit in this suggestion. The Judge did not say there was no testimony to support the theory; his remarks as a whole were directly to the contrary.

### III

■ The final contention is that the prosecuting attorney said things in his summation unsupported by evidence. They had to do with the hardness of the human skull; fragmentation of bullets upon hitting the skull bone; whether or not certain dark marks in the pictures around the hole in the bed leg could be rust marks rather than powder burns; and the distance between appellant and the victim at the time of the second shot. The remarks about the skull bones and fragmentation of a bullet were based upon the testimony of the doctor mentioned earlier herein; the suggestion about rust marks was based upon matters of common knowledge; the evidence concerning distance between the parties is confusing and the attorney was simply stating his recollection thereof. Clearly, we cannot hold that they went so far beyond proper limits that the trial Judge abused his discretion in refusing to strike them; this is particularly true in view of the fact that the trial Judge twice cautioned the jury to rely upon its own recollection of the testimony regardless of what the lawyers had said about it.

\* \* \*

Finding no reversible error, we affirm the judgment below.