[Criminal No. 789. Filed October 30, 1933.]

[26 Pac. (2d) 241.]

SEVERO MIRANDA, Appellant, v. STATE, Respondent.

Mr. H. H. Baker and Mr. Bernard T. Caine, for Appellant.

Mr. Arthur T. La Prade, Attorney General, Mr. James R. McDougall, Assistant Attorney General, and Mr. Glenn Copple, County Attorney, for the State.

LOCKWOOD, J.—Severo Miranda, hereinafter called defendant, was informed against for the crime of murder. He was tried before a jury which returned a verdict of murder in the second degree and recommended extreme leniency. From the verdict and the judgment pronounced thereon, this appeal is taken.

In order that we may discuss properly the assignments of error, a brief summary of the evidence given at the trial is necessary. The undisputed facts are as follows: Defendant and one Vicenti Alvidres, hereinafter called deceased, had been friends for three years or more, during most of which time they were both employed by the Southern Pacific Railroad Company as section men, working part of this time at the same place and part at different localities along the line of the road. On the twenty-second day of October, 1932, deceased, who was then working on a section gang with headquarters at Aztec, Arizona, came to Yuma to visit defendant who was working at the latter place. The latter lived in a two-room apartment which was part of a building maintained by the company for the use of its employees. Along about five o'clock in the morning of October 23d another employee of the company named Hurtado, who lived near, heard defendant calling and went to his apartment. He found the latter on his hands and knees on the floor apparently vomiting. Deceased was lying on a double bed in the room with his head covered with blood from a cut on its side made by some sharp instrument, so that the skull was severed and part of the brains oozing out therefrom. A bloody ax was lying on his body and he was still

living but unconscious. Hurtado immediately called for help and both deceased and defendant were taken to a hospital where the former shortly died as the result of the wound in the head. At the hospital it appeared that defendant had a slight cut on one of his fingers and that a bone therein had been broken. A coroner's jury was impaneled at which evidence was given of the foregoing facts, and defendant, who was present, was asked by the justice of the peace whether he desired to make a statement to which he replied that he did and testified under oath in substance that shortly before he called to Hurtado he was awakened by feeling a warm liquid which afterwards turned out to be blood on his face and found a man who appeared to be a negro standing over him with one knee pressed in his stomach and a knife held to his throat. There was another negro also in the room who rifled the clothes of deceased and defendant and then the two men pulled defendant off of the bed and, as he testified, pushed him underneath it and went away. The officers who arrived at the scene of the tragedy immediately after they were called examined the room carefully, looking particularly under the bed, and stated at the trial that there were two pair of shoes projecting from under the bed and that there was a great deal of dust and dirt thereunder which apparently had not been disturbed for some time. There was also testimony at the trial that about the 3d of October defendant went to Aztec to visit the deceased, arriving there some time in the night, and that when he tried to enter the room of deceased he had with him an ax, and when deceased asked his purpose with the ax stated he brought it along to protect himself from the dogs at the house. Defendant on the stand denied absolutely that he had gone to Aztec on the 3d of October, claiming that that night he was in Holtville, California, but produced no other evidence to sustain this contention, nor did he claim

at the trial that any incident had happened on the alleged trip to Holtville which would enable him to produce a witness that he had been there. During the course of the trial the county attorney had brought into the courtroom the bed on which deceased was lying when he was seen by Hurtado and the officers on the morning of the 23d, together with all the blood-stained bedding, and the same was set up in the presence of the jury and exhibited to them over the most strenuous and repeated objections of counsel for the defendant. There was some other evidence given, but it is not necessary to discuss it in passing on the assignments of error.

It will be seen from the above recital that the evidence upon which defendant was convicted was entirely circumstantial so far as his connection with the homicide was concerned. There is and can be no doubt that deceased was murdered by someone, defendant claiming that it was done by two negroes, and the jury might have found his story to be true. On the other hand, the circumstances under which deceased was found, taken into consideration with the other evidence, is sufficient to sustain a verdict of second degree murder against defendant, nor is there any claim that it is not.

The first assignment of error is that the court refused to grant a motion to set aside the information, made on the ground that the committing magistrate at the preliminary examination did not cause the complaint to be read to the defendant. It appears from the reporter's transcript of the examination that defendant was there represented by counsel. After one witness for the state had been examined his counsel moved to dismiss the complaint and discharge the defendant because the complaint had not been read to him. The trial magistrate stated:

" . . . The complaint was read to the defendant before, and would have been read on this occasion if

he had not been represented by an attorney, but he was represented by an attorney, and the attorney asked for and read the complaint himself. . . . ''

It is true that section 4950, Revised Code of 1928, says:

'' . . . At the examination, the magistrate shall first read to the defendant the complaint upon which the warrant of arrest was issued, unless such reading be waived by the defendant. . . . ''

While the failure to read the complaint was therefore erroneous, yet in view of the fact that defendant was represented by an attorney who had read the complaint, and that defendant himself had previously had it read to him, we think it would be entirely too technical to reverse the case on that ground, since it is obvious that none of the defendant's substantial rights could have been prejudiced. *People* v. *Stein,* 23 Cal. App. 108, 137 Pac. 271; *State* v. *Clark,* 4 Idaho 7, 35 Pac. 710; article 6, § 22, Constitution of Arizona.

The second assignment of error is that the court did not define and submit to the jury a form of verdict based upon manslaughter, nor did it instruct the jury as to that phase of the case. It is the duty of the court, even in the absence of a request therefor, to call to the jury's attention every degree of crime embraced in the information and which the evidence suggests may have existed, without any special request. *Nevarez* v. *State,* 22 Ariz. 237, 196 Pac. 449; *Stokes* v. *Territory,* 14 Ariz. 242, 127 Pac. 742; *Singh* v. *State,* 35 Ariz. 432, 280 Pac. 672, 67 A. L. R. 129. It will be noticed that two things must concur in order that it is necessary for the court to instruct as to any particular degree of homicide. First, it must be charged in the information, and, second, it must appear from some reasonable interpretation of the evidence. If either element is missing, the charge need not and indeed should not be given. Section 4586,

Revised Code of 1928, defines manslaughter as follows:

" . . . Manslaughter is the unlawful killing of a human being without malice. It is of two kinds: Voluntary, upon a sudden quarrel or heat of passion; involuntary, in the commission of an unlawful act not amounting to a felony, or in the commission of a lawful act which might produce death in an unlawful manner, or without due caution and circumspection. . . . "

Section 5050, Revised Code of 1928, reads:

" . . . Upon a trial for murder, the commission of the homicide by the defendant being proved, the burden of proving circumstances of mitigation, or that justify or excuse it, devolves upon him, unless the proof on the part of the prosecution tends to show that the crime committed only amounts to manslaughter, or that the defendant was justifiable or excusable."

Taking these sections together it is apparent that when the state has proved the commission of a homicide by a defendant, the presumption is that he is guilty of either murder in the first or second degree, unless the proof offered by the state itself tends to reduce the offense to manslaughter or show that the defendant was justifiable or excusable. In the present case there is nothing in the evidence which would justify a jury in having even a reasonable doubt that if the defendant indeed committed the homicide, that it must have been murder in some degree. There is not the slightest intimation of a sudden quarrel or heat of passion. Neither is there any intimation that the killing was involuntary and in the commission of an unlawful act or in the commission of a lawful act without due caution or circumspection. The only defense made is that defendant had nothing whatever to do with the homicide, but that it was committed by some other person. Counsel for defendant cite in support of the assignment the cases

of *State* v. *Magers,* 35 Or. 520, 57 Pac. 197; *Aguilar* v. *Territory,* 8 N. M. 496, 46 Pac. 342; *Rachford* v. *Commonwealth,* (Ky.) 28 S. W. 499; *Brown* v. *Commonwealth,* 117 Ky. 766, 78 S. W. 1126; *Stanley* v. *Commonwealth,* 184 Ky. 237, 211 S. W. 577.

In the case of *State* v. *Magers, supra,* the discussion by the court of the principles applying in regard to the necessity of an instruction on manslaughter when the evidence of the guilt of defendant is purely circumstantial is very complete and covers every matter considered in the other cases cited, and we therefore quote its conclusions. It states the rule in substance to be that in jurisdictions where, like ours, the rule prevails of imposing upon the accused the burden of proving facts which tend to reduce the defense of murder in the second degree, the presumption of malice is not invoked except upon clear proof of the killing by the party charged therewith, but says:

" . . . Where, however, the killing is not proved by any eyewitness to have been done by the party charged therewith, and circumstantial evidence is relied upon to establish his guilt, an instruction to the jury, *in the absence of any evidence tending to show the manner of the killing,* that they may return a verdict of guilty of murder in the first or second degree only, is to infer from the circumstances that the defendant committed the act, and from such deduction to presume that the killing was malicious; thus, in violation of our statute . . . founding a presumption on an inference instead of a particular fact. . . . " (Italics ours.)

Under our statute malice may be either express or implied, and the two kinds are defined as follows:

" . . . It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature; it is implied where no considerable provocation appears, or when the circumstances at-

tending the killing show an abandoned and malignant heart.''

Assuming for the moment that the rule laid down in the Magers case is correct, and that the state must show by some evidence not merely the killing but that malice existed, let us examine the evidence to see whether it shows a deliberate intention unlawfully to take away the life of a fellow creature or ''an abandoned and malignant heart'' on the part of the killer. It is only reasonable to presume from the evidence above quoted that deceased was killed by a blow from an ax delivered upon the side of his head. The condition of the bed in regard to blood and the manner in which it had splashed and also had soaked entirely through the mattress indicates that the blow was inflicted upon him when he was lying on his side upon the bed and facing the wall, with his back toward the place where his assailant, taking into consideration the position of the bed in the room, must have necessarily stood. We think it is no unreasonable inference for the jury to determine from these facts that whoever killed him must have had a deliberate intention to take away his life, for it is not reasonable to presume that in a killing surrounded by these circumstances it occurred in a quarrel or the commission of some unlawful act not amounting to a felony. Certainly to strike a man upon the head with a sharp blade of an ax when the deceased is lying down implies an intent to kill. Such being the only natural and reasonable inference which could be drawn from the manner in which the killing occurred, as to the intent of the killer, we think the circumstances of the case show express malice and such being true the principle invoked by defendant and sustained by the cases which he cites does not apply to the facts of the present case. They are similar rather to those found in the cases of *State* v. *Trujillo*, 27 N. M. 594, 203 Pac. 846; *Bast* v. *Commonwealth*,

124 Ky. 747, 99 S. W. 978. In the last-named case the court said: " . . . it will be seen that this court has not laid down the rule that in every case where there are no eye-witnesses to the killing, and the evidence is purely circumstantial, it is the duty of the trial court to give to the jury all of the law of homicide that might be given upon any state of case. . . . *Where the physical facts . . . are such as to preclude the idea or the possibility that the killing was the result of an accident, or that it was a result of a sudden affray,* then the trial court would be warranted in refusing to give an instruction on the subjects of voluntary or involuntary manslaughter. . . . " (Italics ours.)

We conclude, therefore, that upon the evidence in the case at bar the trial judge was justified in not submitting to the jury the issue of manslaughter, just as under that evidence it was unnecessary to give any instruction upon the issue of self-defense.

The third assignment of error is that the court improperly admitted in evidence the bedstead and bedding soaked and splattered with blood on which the deceased was found. It is urged most strenuously that the only effect of the admission of this gruesome exhibit was to prejudice the jury against the defendant, and that it served no evidentiary purpose in any of the controverted issues of the case. We have discussed the question of the exhibition of physical objects connected with a homicide in the case of *Janovich* v. *State,* 32 Ariz. 175, 256 Pac. 359, and have held substantially that if the physical objects have any bearing upon any of the issues of the case they may be admitted, nowithstanding that these objects perhaps may also have a tendency to prejudice the jury against the person committing the homicide, and that the discretion of the trial court in this connection will not be disturbed unless it has clearly been abused. From our discussion of the previous assign-

ment of error, it is evident that one of the important issues in this case is whether or not malice accompanied the homicide, and we think the bed and mattress upon which defendant was lying when he was discovered by the officers bore mute witness to his position and conduct at the time the fatal blow was struck, and was the principal if not the only evidence offered by the state which bore on the question of malice. Such being the fact, the court did not err in permitting the bed, mattress and bedding to be exhibited to the jury in as nearly as possible the position and condition in which they were at the time of the homicide.

The fourth assignment of error is that the court was wrong in admitting in evidence at the trial that portion of the transcript of the testimony given by defendant at the inquest held on deceased. The record shows that defendant was at the inquest presumably under arrest, and not represented by counsel. It also shows, however, that he offered his testimony freely and voluntarily after the coroner had explained his rights to him, and that he could ask for counsel and did not have to testify unless he wished, and that whatever he said might be used against him. Certainly under these circumstances there was no error in allowing him to make any statement he desired, and afterwards using such statements against him as admissions against interest. The test ordinarily used is as to whether the statements made were voluntary or under compulsion, and when they are not offered as confessions but as admissions against interest they are construed less rigidly. *Indian Fred et al.* v. *State,* 36 Ariz. 48, 282 Pac. 930; *Lawrence* v. *State,* 29 Ariz. 247, 240 Pac. 863.

The last assignment of error is that the court erred in denying the motion for new trial because of newly discovered evidence. It appears that as part of the state's case evidence was offered tending to show

that at a previous time defendant had been seen under circumstances which would indicate that he might have harbored designs on the life of deceased. Defendant denied his presence at the place where it was testified that he had been, but offered no evidence in corroboration of his testimony. On the motion for new trial an affidavit was presented signed by one Roy Stacy, who claimed to have seen defendant at a time and place which would have made it impossible to have been at the place where it was claimed by the state he had been seen. If the defense had been one of alibi, and the newly discovered evidence tended to support that claim, the question would be of more difficulty, but it was upon what was after all merely a collateral issue and the evidence was only cumulative. Even more important, however, was the fact that defendant must have known at the time of the trial, if his story of his trip to Holtville were true, that he did have his tire changed at the time and in the manner indicated in the affidavit made by Stacy, and that reasonable diligence on his part required that immediately after he discovered the state expected to attempt to show his presence at Aztec on the 3d of October, he should have made an effort to secure the attendance of Stacy at the trial. Under these circumstances we cannot say affirmatively that the trial court erred in refusing to grant a new trial on these grounds. We have considered carefully all of the objections urged by defendant and are satisfied upon the whole case that no prejudicial error requiring its reversal appears. The judgment is affirmed.

ROSS, C. J., and McALISTER, J., concur.