THE STATE OF OHIO, APPELLEE, *v.* CALLIHAN, APPELLANT.

(No. 810—Decided June 29, 1967.)

*Mr. Everett Burton,* prosecuting attorney, and *Mr. Thurl R. Blume,* for appellee.

*Mr. Ernest G. Littleton,* for appellant.

GRAY, J.  This cause is in this court on appeal on questions of law from a judgment of the Common Pleas Court of Scioto County.

Defendant was indicted for the first degree murder of June Chisholm.  He was tried on that charge and convicted of second degree murder.

Defendant had been a friend of the deceased for a number of years, as had his former wife, Hazel Callihan.  Hazel Callihan had married Henry Hale on June 8, 1966, and had gone to

Columbus, Ohio, to live. About two years before June 13, 1966, Earl Callihan had been divorced from Hazel Callihan and for some time thereafter they cohabited as man and wife, without being legally remarried.

Early on the morning of June 13, 1966, defendant came to Portsmouth, Ohio, from South Portsmouth, Kentucky, where he lived. He first went to Kilcoynes Bar and had two bottles of beer. He then went to Funny Porter's Bar. He then proceeded to the Sportsman's Bar and there purchased a revolver. He next went to a market where he purchased 12 shells for the revolver. His stated purpose for purchasing the gun was to kill or scare dogs that had been killing his chickens on his ten-acre farm.

He visited several more bars. His truck became disabled. While waiting for his truck to be towed away he decided to visit the deceased, June Chisholm, who lived nearby.

The defendant, feeling aggrieved concerning the verdict of the jury and resultant judgment of the court, filed his notice of appeal and assigned the following errors:

"1. The court erred to the prejudice of the defendant in admitting evidence offered by the state respecting an alleged offense and certain threats alleged to have been made by the defendant against his former wife for the purpose of showing motive or intent in the instant case which alleged act and threats had no logical connection and were unrelated to the offense for which the defendant herein had been placed on trial.

"2. The court erred in respect to its charge to the jury in failing to instruct the jury respecting the included offense of manslaughter.

"3. The verdict of the jury is contrary to and against the manifest weight of the evidence presented in the trial of this cause."

Since defendant has assigned error number two it will be necessary to weigh and analyze the evidence to determine whether the trial court committed prejudicial error in not charging on the crime of manslaughter.

When defendant visited the deceased he arrived at the back door through an alley-way.

One of the witnesses testified that just before the deceased

was killed he heard someone call her. The deceased answered: "I am out here on the porch, Earl. Come on out here." There was some conversation between the two, and the gist of it was that defendant wanted her to come into her apartment and she wanted him to come out on the porch. She reluctantly went inside. This witness then heard a loud report.

Defendant stated that the reason he did not come out on the porch was because he did not want anybody to see him with the gun, as it wouldn't go all the way in his trouser pocket. He said he told her about his truck breaking down and the reason for his purchasing the gun. He then pulled out the gun to show it to her. It accidently discharged as he was removing the gun from his trouser pocket. The bullet struck her in the right front parietal area of the skull causing extensive damage to her brain and ultimately causing her death. The gun was at least six feet away from the deceased when it was discharged as there were no powder burns around the wound. She was sitting in a chair, while he was standing, when the gun was discharged. She pitched forward and fell on the floor. He looked at her, saw blood on her face, grabbed his gun which had fallen on the floor, and ran out the back door and went to the Scioto Tavern.

At the tavern defendant engaged Dennis Jordan, the husband of the manager, in a conversation. Defendant told Jordan that the gun would smoke and that he had not been target practicing. Defendant further told Jordan: "When I shot the son of a bitch her eyes shot clear out on her cheeks."

Defendant and Jordan then returned to defendant's truck for cigarettes, and on the way defendant cautioned Jordan not to turn him over to the police or he would kill him too. Defendant reloaded his gun while he was at the truck. There is evidence that defendant had moonshine liquor in his truck that day.

Defendant had made several trips to the Kentucky Tavern, and about 10:30 or 11 a. m. he came in swinging the gun around in his hand. He said to a female employee of the tavern: "If the cops come in I will shoot them." He further stated that he had used it once and would use it again if he had to. This witness testified that defendant wasn't drunk but appeared to be very angry.

Defendant, between noon and 12:30 p. m., called a friend, Eula Pack, and said: "I shot old June and I didn't mean to."

Defendant then went to the Kentucky Tavern and while there said to the tavern operator: "Koch, if you don't think it will work I will show you." Defendant then proceeded to shoot a hole through the floor with his revolver.

Defendant, referring to his revolver, further said: "I had better put another one in there. I might need it." He further said that if the police came up to the door he would blow them out.

In the afternoon, after 1 p. m., he was showing off the gun in the Scioto Tavern. He shot the gun in there also. Defendant said that he had shot the gun before and that it was a good gun.

When defendant was arrested in the Scioto Tavern he was seated about 35 feet from the door. Two plain clothes detectives approached him, and, when they were 15 or 20 feet from him, defendant put his hand into his pocket. Defendant was attempting to take his gun out of his pocket when one of the officers disengaged his hand from the weapon and removed his hand from the pocket.

The gun and bullet were sent to the Ohio Bureau of Criminal Investigation where it was determined that the bullet recovered from the brain of June Chisholm was fired from the gun taken from the person of defendant.

Tests also revealed that it required 6½ pounds of pull to fire the gun when cocked and 11 pounds of pull to both cock and fire it.

Defendant testified that deceased was his good friend and had been like a mother to him and his former wife, Hazel. There was testimony, however, that several years previous to June 13, 1966, deceased had visited defendant's home and defendant had ordered her out of his house saying: "Get out of the house or I will kill you some day."

The inference is present that the marriage of defendant's former wife on June 8, 1966, to Henry Hale, the friendship of Hazel Callihan and June Chisholm, defendant's threat to kill the deceased and the killing of June Chisholm by defendant on June 13, 1966, are interrelated.

On the other hand, defendant testified that he had never had any trouble or even an argument with her in his life.

In his opening statement defendant's attorney stated that defendant had shot June Chisholm, and the defense to the charge of first degree murder was, simply and purely, that it was done accidentally. The defendant's theory of the case was presented fully to the jury in the court's charge.

The defendant, being the only living eye witness, had his choice of defenses. He could have said that he had an argument with her and, upon provocation, or in hot blood, or both, he killed her. He decided not to adopt this tactic, but instead chose to try for acquittal by claiming the shot was an accident. The jury didn't believe him, and quite frankly neither do we. He testified that she was like a mother to him and that he had never had an argument with her. This would eliminate provocation of defendant by deceased at the time she was killed. He was not unlawfully pointing fire arms according to his version because it was an accident and he didn't know how the gun was discharged when he took it from his pocket.

It is not an unknown fact to members of the legal profession that defendants under circumstances such as these have at times colored the facts of a case in an attempt to lessen or eliminate the penalty that might be imposed for the commission of a homicide.

Defendant, at times in his testimony, stated that he did not want anyone to see the gun. However, he exhibited it freely in several bars and discharged it in two of them.

It stretches beyond limit the credulity of persons reading this record to adopt the theory of defendant that the death of June Chisholm was an accident. We do not want to recount all the facts hereinbefore set forth. However, we do wish to make some observations.

A person does not call a woman, who was a mother to him and with whom he never had an argument, a "son of a bitch" unless he has a bitter feeling towards her.

Why did defendant come to the home of the deceased by the back way and call her inside her home when she was reluctant to go just to show her a gun? Why did he keep it fully loaded at all times? Other questions arise: Why did defend-

ant have his finger on the trigger when he took the gun out of his pocket? Why did he exert pressure on the trigger sufficient to fire the gun? Why was the gun pointed at her when it was taken from his trouser pocket? Why did he show her the gun at all? Why did he go to see her in the first place? If he had to show her the gun, why did he have to show her a loaded gun? After all she could not see the shells which were inside the cylinder.

The threats he made to Jordan and the threats he made concerning the police are indicative of the workings of his mind.

Defendant's actions throughout show great indifference to the fate of the deceased. He didn't call a doctor or an ambulance, nor did he report the matter to anyone.

His flight from the scene of the crime exhibited *mens rea*.

"Flight from justice, and its analogous conduct, have always been deemed indicative of a consciousness of guilt. * * *

"It is to-day universally conceded that the fact of an accused's flight, escape from custody, resistance to arrest, concealment, assumption of a false name, and related conduct, are admissible as evidence of consciousness of guilt, and thus of guilt itself [.]'' 2 Wigmore on Evidence (Third Ed.), 111, Section 276, and cases cited.

The testimony of defendant, who was the only living eye witness, negatived any and all elements of manslaughter, *i. e.*, sudden quarrel, provocation or unlawfully pointing a fire arm. It was an accident, pure and simple.

The Supreme Court has defined the crime of manslaughter as follows in paragraph seven of the syllabus of *State* v. *Robinson*, 161 Ohio St. 213:

"One who inflicts a mortal wound in a sudden affray or in heat of blood or passion, without time for reflection or for passions to cool, is guilty of manslaughter in the first degree."

According to defendant's own testimony none of these factors were involved in the killing.

The theory and evidence of the prosecution did not encompass manslaughter. If it had, however, the testimony of defendant would have nullified it. Defendant chose his defense and the theory thereof and thus was bound by it.

These are the actions and words of a man who came to town to do a job and did it.

Defendant's version of the killing did not impress the jury nor does it impress us. He was called upon for an explanation. He gave it. The jury did not believe it. Upon this point we again cite *State* v. *Robinson*, 161 Ohio St. 213. The court said in the sixth paragraph of the syllabus:

"Where the fact of killing is proved, malice is to be presumed, and all the circumstances of justification, excuse, or extenuation must be made out by the accused, unless they appear from the evidence adduced against him."

In a prosecution for first degree murder, where, according to state's testimony, the shooting by accused was deliberate, and, according to the accused, the shooting was accidental, the issue of manslaughter is not raised, and a complete charge on accidental shooting fully protects accused in his rights.

The second assignment of error is not well taken.

The court comes now to consider the first assignment of error.

The record shows that Hazel Callihan was divorced from Earl Callihan on June 8, 1964. For about two years, Earl and Hazel Callihan lived together in an illicit relationship. Hazel testified, over objection of defendant, that in the latter part of August 1965 defendant hit and beat her, got out his shotgun and told her that he was going to kill her. She told him to go ahead. He shot the gun over her head.

Defendant claims that the introduction of this evidence was prejudicial error due to the fact that the acts committed by defendant when he and his former wife were living together subsequent to the divorce were privileged.

We think that this assignment of error is not well taken.

"The general rule which renders a husband or wife incompetent to be a witness either for or against the other has no application unless they are legally married. Where they live together in illicit cohabitation, whether she is to be regarded as a mistress or with a higher degree of respect, either is a competent witness in an action in which the other is a party. The sincerity of the parties in undertaking to marry or their belief that a legal and valid marriage has in fact been consummated

is entirely immaterial if by reason of circumstance no marriage in fact exists. * * *"  58 American Jurisprudence 139, Witnesses, Section 203.

Thus, a divorced wife is competent to testify against her divorced husband in a criminal action against him as to facts that did not come to her knowledge while the marriage relation existed. Such evidence was admissible under Section 2945.59, Revised Code, and the rules of evidence.

Finally, defendant claims that the verdict of the jury is contrary to and against the manifest weight of the evidence presented in the trial of this cause.

This assignment is without merit. A verdict of guilty to a charge laid in an indictment will not be set aside as contrary to and against the manifest weight of the evidence, where the evidence tends to sustain all the essential elements charged in the indictment against the defendant. *State* v. *Axe*, 118 Ohio St. 514; *Painesville Utopia Theatre Co.* v. *Lautermilch*, 118 Ohio St. 167; *Cooper* v. *State*, 121 Ohio St. 562.

Let it be said that the state of Ohio and the defendant were both well represented. The judge presided over the trial in a fair and impartial manner. The defendant received a fair trial. We find no error in the proceedings. Therefore the judgment is affirmed.

*Judgment affirmed.*

Carlisle, P. J., and Abele, J., concur.