449 P.2d 39

**STATE of Arizona, Appellee,**

**v.**

**Rebecca B. MADDEN, Appellant.**

**No. 1745.**

Supreme Court of Arizona.

In Banc.

Jan. 3, 1969.

**112**

Gary K. Nelson, Atty. Gen., Lloyd D. Brumage, Pinal County Atty., for appellee.

Lewis, Roca, Scoville, Beauchamp & Linton, by John P. Frank, John J. Flynn, Terry D. Oehler, Paul G. Ulrich, Phoenix, for appellant.

HATHAWAY, Judge, Court of Appeals:

Rebecca B. Madden was charged under A.R.S. § 13–451 with the murder of her husband. The cause was tried to a jury, and she was found guilty of murder in the second degree. On August 15, 1966, she was sentenced to ten to twelve years imprisonment.

Before setting forth the specific questions presented on this appeal, relating principally to selection of the jury, correctness of instructions, and participation in the proceedings by a judge other than the trial judge, we will briefly review the facts.

In the spring of 1965, the defendant and her husband began having marital difficulties which subsequently resulted in separation and divorce. On March 25, 1966, shortly after the hotly contested divorce trial, Mr. Madden was exercising his visitation rights with their nine-year-old son, Michael. In the late afternoon, prior to his departure for the defendant's residence to take Michael back, he and the defendant had two or three quarrelsome telephone conversations.

The defendant's residence was situated in a somewhat remote area near the Superstition Mountains. Before Madden's arrival with Michael, the defendant placed her shotgun in the back seat of her car, and drove through and locked the gate to the grounds of the main ranch house. She then drove to the trailer home of Gus Seber, the caretaker, situated a few hundred yards away, and awaited Madden's arrival. When Madden drove up to the gate, Michael attempted to open it and found it locked. Madden turned the car around and drove to Seber's trailer, pulling up behind the defendant's car. Seber had spotted Madden's vehicle as it arrived at the gate to the main house and had notified the defend-

ant. They both went outside the trailer, but Seber returned inside at the defendant's direction.

As Michael got out of his father's car, he saw his mother standing by her car with the shotgun in her hand. She told him to go into Seber's trailer. He went inside and joined Seber in watching television. Several dogs were running back and forth barking in the trailer. The noise caused by the dogs and the television prevented Seber and Michael from hearing anything from outside. Moments later, the defendant came into the trailer and told Seber to call the police. He could not find the number and the defendant took the telephone from him. She called the Pinal County Sheriff's office, and told the dispatcher:

"This is Mrs. Madden. My husband was trespassing on my property and I just shot him. Will you please send an officer to Meanwhile Ranch."

A sheriff's deputy who knew the defendant arrived approximately fifteen minutes later. When he asked her how she was, she responded, "I am sorry I did this." The deputy saw Madden lying on the couch with a wound in his chest, and called an ambulance. Madden's only utterances were pleas for help, requests for water, and statements that he was dying. He gave no details of the shooting. He was alive when placed in the ambulance, but expired enroute to the hospital.

The defendant testified that the shooting was accidental; that her husband grabbed the gun, causing it to discharge; that she had no intention of shooting or killing him.

The defendant initially contends that the systematic exclusion from the jury for cause of all persons who objected to the death penalty deprived her of an impartial jury, and left a group composed of "authoritarian, prosecution-prone" people. In Witherspoon v. People of Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), the same argument was made. Because of the death penalty fixed by the jury in Witherspoon, reversal was decreed in view of the exclusion for cause of veniremen who objected to the death penalty or expressed conscientious or religious scruples against its infliction.

■ Witherspoon, being a capital punishment case, is inapplicable here, however, as a basis for reversal. Bumper v. State of North Carolina, 391 U. S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968). Witherspoon does, however, meet the defendant's argument that a jury so selected must necessarily be biased in favor of conviction.[1] The court, in Witherspoon, found that the date submitted by the petitioner was too fragmentary, and would not conclude on the basis of the record or from judicial notice that an unrepresentative jury resulted on the issue of guilty, or that there was a substantial increase in the risk of conviction. We have reviewed additional material submitted by the defendant and conclude likewise.[2]

1. In Witherspoon the petitioner referred to two surveys: one involved 187 college students, W. C. Wilson, "Belief In Capital Punishment and Jury Performance" (unpublished manuscript, University of Texas, 1964); the other involved 200 college students, F. J. Goldberg, "Attitude Toward Capital Punishment and Behavior as a Juror in Simulated Capital Cases" (unpublished manuscript, Morehouse College, undated). He also cited a study based upon interviews wtih 1,248 jurors in New York and Chicago. The results of that study in a preliminary, unpublished summary show that "a jury consisting of only jurors who have no scruples

against the death penalty is likely to be more prosecution prone than a jury in which objectors to the death penalty sit," and "the defendant's chances of acquittal are somewhat reduced if the objectors are excluded from the jury." H. Zeisel, Some Insights Into the Operation of Criminal Juries 42 (confidential first draft, University of Chicago, November 1957).

2. The defendant refers us to Crosson, "An Investigation Into Certain Personality Variables Among Capital Trial Jurors" (Ph.D. thesis, Western Reserve University, 1966); Knowlton, Problems of Jury Discretion in Capital Cases, 101

The defendant next contends that the trial court erred in submitting the first-degree murder charge to the jury, claiming that premeditation had not been established. We have carefully considered the record, in the light most favorable to sustaining the conviction and find that bitter relations had existed between the defendant and the decedent, and that the defendant had stated that she would rather see Madden dead than for him to keep the boy, and "if I don't get the boy back, I will kill him." It was shown that she was beneficiary under insurance policies on Madden's life providing benefits in the sum of $450,000 in case of accidental death. The defendant expected Madden to come to the premises for the purpose of delivering Michael. The locked gate to the main ranch assured his entrance to the area occupied by the trailer. The defendant, with the shotgun in the back seat of her car, drove to the trailer to await Madden's arrival with Michael. At her direction, Seber and Michael entered the trailer, leaving her alone with Madden. She removed the shotgun from her car as he arrived and injected a live cartridge into it. Madden died from the shotgun blast which followed. The foregoing amply supports a charge of first-degree murder.

The defendant also complains on appeal that the trial court should not have given the "lying in wait" instruction. The instructions are not set out in the brief as required by Rule 5(b) (10), Rules of the Supreme Court, 17 A.R.S. This rule is equally applicable to criminal appeals, Rule 15, Rules of the Supreme Court. An appellate court is under no obligation to consider the challenged instruction where its rules have not been followed. Johnson v. United States, 370 F.2d 495 (9th Cir. 1966). In any event the defendant, having been convicted of second-degree murder, was not prejudiced by the "lying in wait" instruc-

tion, which we recently considered in detail in State v. Brooks, 103 Ariz. 472, 445 P.2d 831 (1968); Walker v. People, 126 Colo. 135, 248 P.2d 287 (1952); State v. Goettina, 61 Wyo. 420, 158 P.2d 865 (1945); 41 C.J.S. Homicide § 427, para. d; Viliborghi v. State, 45 Ariz. 275, 43 P.2d 210 (1935); Wootton v. State, 232 Ark. 300, 337 S.W.2d 651 (1960); State v. Aubuchon, 394 S.W.2d 327 (Mo.1965); Ruffin v. State, 11 Terry 83, 50 Del. 83, 123 A.2d 461 (1956). Any error is cured by the acquittal of first-degree murder.

The defendant contends that the court erred in failing to instruct the jury on voluntary and involuntary manslaughter. The court is duty-bound to instruct the jury on every degree of homicide embraced in the information and which the evidence suggested may have existed, even though no request has been made therefor. Arizona Rules of Criminal Procedure 276, 17 A.R.S.; Singh v. State, 35 Ariz. 432, 280 P. 672, 67 A.L.R. 129 (1929); Miranda v. State, 42 Ariz. 358, 26 P.2d 241 (1933); Antone v. State, 49 Ariz. 168, 65 P.2d 646 (1937). The State responds that manslaughter is not within the scope of the evidence, and, having carefully considered the record, we agree. Our statutory definition for voluntary and involuntary manslaughter is as follows:

"1. Voluntary, upon a sudden quarrel or heat of passion.

"2. Involuntary, in the commission of an unlawful act not amounting to a felony, or in the commission of lawful act which might produce death in an unlawful manner, or without due caution or circumspection." A.R.S. § 13–456

The defendant related the following account of the shooting:

"A  Two things happened, Mr. Johnson. Number one, I know I pushed the

U.Pa.L.Rev. 1099 (1953); Oberer, Does Qualification of Jurors for Scruples Against Capital Punishment Constitute Denial of Fair Trial on Issue of Guilt?, 39 Texas L.Rev. 545 (1961); McClelland, Conscientious Scruples Against the Death Penalty in Pennsylvania, 30 Pa.B.A.Q. 252 (1959); the report of a study by Dr. Cody Wilson in "The Texas Observer," November 27, 1964, p. 5; and a report by Dr. Hans Zeisel in the "National Observer," August 30, 1965, p. 5.

safety and told him I was doing it. The second thing I pumped the gun to show it was loaded.

\* \* \* \* \* \*

"Q  Take your hand down and look at me and tell me what occurred.

"A  He said something about, 'You are bluffing, and I will wrap that gun around your neck,' and he came at me and grabbed the gun (indicating). It went off. That's all I can say.

"Q  Did you pull that trigger?

"A  It went off, Mr. Johnson. I didn't pull the trigger.

"Q  Did you intend to pull the trigger?

"A  No, sir.

"Q  Now, you say he grabbed the gun?

"A  Yes, sir.

"Q  Do you know?

"A  He pulled it (indicating), he grabbed it and pulled it, pulled it this way (indicating with hands)."

█  The defendant's position was that she did not kill Madden. The defense evidence that she did not intend to kill him precluded the giving of a voluntary manslaughter instruction. Harding v. State, 26 Ariz. 334, 225 P. 482. Nor would the evidence support an instruction on involuntary manslaughter, since the homicide was not caused, even from the defendant's point of view, by her culpable negligence; rather, the shotgun was accidentally discharged when Madden attempted to grab the weapon from her. Since the state of the record was such that the defendant could only be guilty of the crime charged, or not guilty at all, manslaughter instructions were not required.[3]  State v. Schroeder, 95 Ariz. 255, 389 P.2d 255 (1964); People v. Finch, 213 Cal.App.2d 752, 29 Cal.Rptr. 420 (1963); State v. Callihan, (1967), 11 Ohio App.2d 23, 227 N.E.2d 654; Fleming v. State, Okl. Cr.App., 401 P.2d 997 (1965); Redding v. State, 214 Ga. 524, 106 S.E.2d 5 (1958).

The final question raised concerns the propriety of the taking of the verdict by a judge other than the trial judge. After the matter was submitted to the jury, counsel agreed that a local judge, Judge Mahoney, could take the verdict, and that the trial judge could return to his home in Tucson. Before returning to Tucson, the trial judge, Judge Roylston, conferred with Judge Mahoney concerning the manner in which further proceedings were to be conducted. The jury began its deliberations shortly after five o'clock on June 28, 1966.

Just after three o'clock in the afternoon of the 29th, while the jury was still in deliberation, defense counsel obtained permission from Judge Mahoney to call Judge Roylston to determine how long Judge Roylston intended the jury to continue its deliberations. Defense counsel avers, by affidavit, that Judge Roylston gave him the following instructions, which he delivered to Judge Mahoney:

"1. Ask Judge Mahoney to forthwith bring the jury into the courtroom and ask the jury for their opinion as to whether they could arrive at a verdict.

"2. Under no circumstances was Judge Mahoney to ask how they 'stood' numerically.

"3. If, 'a majority' of the jury indicated that they could not see any possibility of arriving at a verdict, they were to be immediately discharged and Judge Mahoney was to declare a mistrial."

3.  The transcript of the hearing on defendant's motion for a new trial discloses the fact that the trial judge was of the opinion that the evidence did not justify manslaughter instructions:

"THE COURT: I think I was the first one who first suggested that I didn't see that a manslaughter verdict could properly be rendered. The defense attorneys agreed right off."

The bailiff was then directed to bring the jury to open court, where the following occurred:

> "JUDGE MAHONEY: Ladies and gentlemen, will you indicate how you stand one way or the other? *Will you indicate to the court whether or not you feel that there is any possibility of arriving at some type of verdict within a reasonable time?*
>
> "THE FOREMAN: *I don't believe so.*
>
> "THE COURT: And does anyone object to that? Because of the situation and the length of the trial, the court will request that you do deliberate further. And we will check you a little bit later. So at this time you may be excused. And we will check you in about two hours. Stand at recess." [Emphasis added.]

Within a short time after they were returned to the jury room, the jury arrived at a verdict of guilty of murder in the second degree.

Defense counsel contends that Judge Mahoney abused his discretion because he departed from the instructions of the trial judge by sending the jury back to deliberate further after it had reported a deadlock. He contends that each of the jurors indicated, by raising his hand, that no verdict was possible. Jurors' affidavits were offered for the purpose of establishing that Judge Mahoney's instructions about further deliberation operated to "coerce" the jury to reach a verdict.

We do not believe that Judge Mahoney's instruction to the jury to deliberate further had the "blackjack" compulsion that the defendant attributes to it.

First, counsel agreed that Judge Mahoney could take the verdict. Second, defense counsel requested that he be permitted to contact Judge Roylston for instructions. Instructions were obtained, and it appears that they were substantially followed. The defendant cannot now claim error, where the trial court was attempting to comply with defense counsel's request to determine whether the jury was hopelessly deadlocked. The judge's query, "Whether there is some possibility of arriving at some type of verdict within a reasonable time," was really the only reason for reconvening the jury. The trial judge did not find the circumstances such as to require a new trial. We find no abuse of discretion in his determination, and decline to disturb the trial court's ruling. State v. George, 100 Ariz. 350, 414 P.2d 730 (1966); State v. Byrd, 94 Ariz. 139, 382 P.2d 555 (1963).

We find that the trial judge was not called upon to exercise a discretion demanding familiarity with the facts of the case when it sent the jury back to deliberate further. Furthermore, counsel agreed that the verdict might be taken by the local judge. We find no prejudice to the defendant in this procedure.

The defendant finally complains that the verdict was not unanimous and offers affidavits of two jurors for the purpose of showing that they did not concur therein. Consideration of these affidavits for purposes of impeaching the verdict is foreclosed. State v. Murphy, 79 Ariz. 161, 285 P.2d 614 (1955). It is contended that Judge Mahoney erred in not polling the jury on his own motion as provided by Rule 284 of the Rules of Criminal Procedure.[4] Though given an opportunity to

---

4. Rule 284, Rules of Criminal Procedure, provides:

"If any juror announces that the verdict returned by the foreman is not the verdict agreed on, or that it was not concurred in by the required number of jurors, or that he no longer concurs in it, the court shall cause the jurors to be asked severally if it is their verdict. If the required number answer in the affirmative the verdict shall then be entered of record and the jurors discharged, but if the required number do not answer in the affirmative the court may direct them to reconsider their verdict. In any case the court may on its own motion and shall on motion of either party poll the jury."

poll the jurors, defense counsel chose not to do so.

█ In the absence of a request, the court has no duty to poll the jury, Commonwealth v. Patrick, 416 Pa. 437, 206 A.2d 295 (1965); Nance v. State, 210 Tenn. 328, 358 S.W.2d 327 (1962), and failure to poll under such circumstances is not a denial of a constitutional right. People v. Lessard, 58 Cal.2d 447, 25 Cal. Rptr. 78, 375 P.2d 46 (1962). See also Anno. 49 A.L.R.2d 619, cases collected in § 6, pp. 629–634.

Having carefully considered the record and the points raised in this appeal, we find no prejudicial error in the proceedings and conclude that the defendant received a fair trial.

The judgment is affirmed.

McFARLAND, C. J., UDALL, V. C. J., and LOCKWOOD, J., concur.

NOTE: Justice STRUCKMEYER having disqualified himself from consideration of this decision, Judge HATHAWAY was designated to act in his stead.

BERNSTEIN, Justice (dissenting).

I regret that I must dissent. Under our holdings, instructions on lesser offenses must be given where there is evidence upon which the jury could convict for a lesser offense. In this case, it was error for the trial court to fail to instruct the jury on manslaughter. State v. Schroeder, 95 Ariz. 255, 389 P.2d 255; Singh v. State, 35 Ariz. 432, 280 P. 672.