452 P.2d 500

STATE of Arizona, Appellee,

v.

Clifford E. PREWITT, Appellant.

No. 1785.

Supreme Court of Arizona.

In Banc.

March 28, 1969.

Rehearing Denied April 29, 1969.

Gary K. Nelson, Atty. Gen., Darrell F. Smith, former Atty. Gen., Carl Waag, Asst. Atty. Gen., for appellee.

Michael A. Bosco, Jr., Arthur E. Ross, Phoenix, for appellant.

McFARLAND, Justice.

Defendant, Clifford E. Prewitt, hereinafter referred to as defendant, was charged with the crime of murder of his father and convicted of second-degree murder and sentenced on December 12, 1966, by the court to a term of the rest of his natural life in the Arizona State Prison; and on July 5, 1967, the court, on its own motion, vacated the sentence imposed—evidently because it was not a proper sentence—and appointed two psychiatrists to examine defendant pursuant to Rule 333, Rules of Criminal Procedure, 17 A.R.S. On August 7, 1967, after a hearing, the court found defendant insane and ordered him committed to the Arizona State Hospital. Later, after he was pronounced sane, the court, on the 27th day of October 1967, sentenced defendant to a term of not less than ten years nor more than his natural life to imprisonment in the Arizona State Prison with the sentence to commence as of May 13, 1966. From the judgment and sentence of the court, defendant appeals.

Defendant, at the time the offense was committed, was approximately forty-one years old. He was born of poor parents from the mountains of eastern Kentucky. His parents were separated when he was approximately twelve years of age. His home life was further complicated by the fact that his father, the decedent, forcibly maintained custody of defendant and his younger brother after the separation. His father had been a moonshiner in Kentucky, and defendant was encouraged to start drinking at an early age. Defendant was educated only through the tenth grade, and dropped out of school due to the necessity to earn a livelihood. He was married at an early age—approximately seventeen years—and worked as a truck driver to provide for his wife and family. He later

**328**

built up his own trucking business which he eventually had to give up because of health conditions. During most of his life he was a borderline alcoholic, with a background of psychological disturbances. Many of his mental problems emanated from the alleged cruel treatment he received from his father.

In 1959 defendant's oldest child developed arthritic conditions, and for this reason he moved to Arizona. After arriving in Arizona he was gainfully employed, and for a period of time had his own business. Defendant had quit drinking, but approximately three years prior to the killing of his father he again started drinking excessively, which resulted in a deterioration of his marriage, a divorce, and the loss of his ability to hold a job. He remarried, and, at the time of the incident, had become financially dependent upon his second wife and his father. He began to realize that he had mental problems, and from time to time—either on his own initiative or on petitions filed by members of his family—he was committed to the Arizona State Hospital for treatment as an outpatient.

Defendant had sought help from a minister, and at times had stopped drinking, but on the day of the incident he started drinking heavily and patronized several taverns before he went home. His father, the decedent, lived with defendant, and upon defendant's arrival home a quarrel started between him and his father. The only eyewitness to the incident was his 13-year-old stepdaughter, Marilyn Fleenor, who testified that during an argument defendant pulled a .357 Magnum pistol and a holster from his dresser drawer; that decedent took an ax and commenced to hit the gun and holster in an attempt to make defendant put it away. She further testified that defendant threatened to kill his father if he continued to argue with him. According to Marilyn, the decedent raised the ax and hit the gun several times, trying to knock it out of defendant's hands. Defendant then loaded the gun, and stood in the doorway of decedent's room. The decedent still had the ax in his hand. However, there was no evidence of an attack. It was at this point that defendant fired one fatal shot through his father's chest.

■ Defendant first assigns as error the failure of the trial court to direct a verdict of acquittal as to first and second-degree murder, contending that the evidence and the law did not warrant the submission of first and second-degree murder to the jury, and that the State had not carried the burden of proof as to the elements of those offenses.

Defendant had entered a plea of not guilty and not guilty by reason of insanity. His counsel now contends the evidence indicates that defendant had been provoked by decedent's conduct, and that he had no alternative but to shoot him; also, that the State had failed to carry the burden to prove sanity at the time of the commission of the offense; and that, due to defendant's insanity, he was incapable of committing first or second-degree murder. At the end of the State's case, counsel moved for a directed verdict; and, at the end of all the testimony, he again made a motion for acquittal as to first and second-degree murder. Both were denied.

In State v. Schantz, 98 Ariz. 200, 403 P.2d 521, we held that where insanity is an issue the burden is upon the State "to establish beyond a reasonable doubt" the converse. Defendant urges that the evidence of the State was not sufficient to show beyond a reasonable doubt that he was sane in accordance with the test set forth in State v. Schantz, supra; namely:

> "This test of legal insanity has two elements. An accused must have had at the time of the commission of the criminal act:
>
> "(1) Such a defect of reason as not to know the nature and quality of the act, or
>
> "(2) If he did know, that he did not know he was doing what was wrong."

He calls attention to Rule 270, Rules of Crim.Proced., 17 A.R.S., which provides:

"If at the close of the evidence for the state or at the close of all the evidence the court is of the opinion that the evidence is insufficient to warrant a conviction, it may, and on the motion of the defendant shall, direct the jury to acquit the defendant."

Counsel urges that under this rule it was the duty of the court to have directed a verdict of acquittal as to first and second-degree murder.

Rules 273, Rules of Crim.Proced., 17 A.R.S., provides:

"All questions of law shall be decided by the court and all questions of fact by the jury, except as provided in Rule 173. The jurors shall apply to the facts the law as given to them by the court."

This Court's interpretation of this rule is set forth in State v. Norgard, 103 Ariz. 381, 442 P.2d 544:

"In reviewing the sufficiency of the evidence to support a conviction the evidence must be viewed in light most favorable to the state, and all reasonable inferences must be resolved against defendant. In considering whether a verdict is contrary to the evidence we do not decide whether we would reach the same conclusion as the jury. The question is whether there is competent evidence to support the conclusions found. * * *"

Counsel for defendant relies largely upon the testimony of the expert witnesses in regard to the mental condition of defendant at the time of the commission of the crime. In State v. Cano, 103 Ariz. 37, 436 P.2d 586, we held:

"Defendant Cano contends most strenuously that where expert testimony of insanity has been presented—as in the instant case—then the state has a duty to present positive expert testimony of legal sanity in order to sustain its burden of proof. We are unable to agree with this contention. Expert-opinion testimony is merely evidence to be considered by the jury, together with all the facts and circumstances of the case. State v. McCabe, 251 Minn. 212, 87 N.W.2d 360. Such testimony is no more than a learned man's opinion, and as such it can rise no higher than the validity of the reasons and facts on which it is based. * * *

\* \* \* \* \* \*

"The law has not yet been able to develop a perfect standard by which legal responsibility for crime is to be determined. See State v. Schantz, supra. [98 Ariz. 200, 403 P.2d 521] It is for this reason that the function of the jury becomes of even greater importance in cases where insanity is raised as a defense. In United States v. Pollard, D. C., 171 F.Supp. 474, the court stated the basis for this reasoning as follows:

" 'The psychiatrist merely expounds on the theoretical and clinical aspects of the problem. The jury evaluates his testimony, as it does the evidence on every other factual issue. That is the correct disposition, for the question whether society should assess punishment for criminal conduct is, in the last analysis, a moral judgment. The jury, being of the community, reflects its attitudes and speaks for it.'

" 'The wisdom of this approach is readily apparent. The opinions of experts, testifying as to the degree of responsibility of which the accused may be capable in view of possible mental disease, are, after all, nothing more than theories which are adopted to explain and account for a given act or course of conduct. Eminent psychiatrists have recognized that "the best psychiatry is still more of art than of science", Sullivan, "Psychiatry", 12 Encyl.Soc.Sci. 578, 580; that wide gaps in knowledge exist; that the validity of psychiatric theory can not be determined with scientific certainty. There is still comparatively little known about causes, let alone effective remedies, and the experts are not yet agreed on basic definitions. Nor can it be ignored that not only is there disagreement among experts, but that some psychiatric

doctrines, once considered authoritative, are now rejected. The mystery of human behavior still remains to be solved. These reflections do not deny the value of expert testimony but leaves it to its proper place in the trial of a case.'

"'The test of insanity is different in the federal courts, but the problem of judicial resolution of what is essentially a moral question is the same. Therefore, this court will uphold the jury's verdict where the State has presented sufficient evidence so that the jury might reasonably entertain a theory of the case resulting in belief in defendant's sanity beyond a reasonable doubt. State v. Ganster, 102 Ariz. 490, 433 P.2d 620."

▬ In the instant case counsel points out that Dr. Ruland diagnosed defendant as being "an emotionally unstable personality, passive-aggressive type, with symptomatic use of alcohol," who at the time of the alleged offense was suffering from and in a state of pathological intoxication and that, in his [Dr. Ruland's] opinion at the time of the alleged offense defendant was insane and not rationally aware of the nature and quality of his acts, along with not being capable of distinguishing right and wrong. He also contends that the State's expert, Dr. George Saravia, in part corroborated Dr. Ruland's testimony when Dr. Saravia stated that from his diagnosis he would have the feeling that defendant had no intent to commit the offense charged, and that "it seems to me that he acted on provocation." Acting on provocation in itself does not show insanity. If this were the test there would be little difficulty in proving people insane. Dr. Saravia was vague in his statements in regard to his opinions; for example, following the statement in regard to his own feelings, he testified:

"Q That he had no intent to commit the crime?

"A I don't think—frankly, I don't think that—that he thought about it and stewed about it and decided to commit a crime, no.

"Q In other words, it would be your opinion that he could not reflect at that time or did not reflect at that time?

"A Most likely, he wouldn't."

However, Dr. Saravia, on direct examination, gave a different diagnosis of defendant's case than that given by Dr. Ruland. He stated:

"Well, I diagnosed him as passive-aggressive personality, aggressive type, with chronic alcoholism."

He further testified:

"Q Now, Doctor, let me ask you if, as a result of your examination of the defendant and based upon your training and experience in psychiatry, if you have an opinion concerning whether or not the defendant in the evening hours of May 13 of 1966, had the ability to know the nature and consequences of his actions?

"A I think that under the influence of alcohol, naturally, an individual does not have the same judgment, the same insight into himself. His impulses are under poor control. So, they don't have the clear view of exactly what they are doing.

"But the question is that this has been brought up frequently as well as legal insanity. Then the individual was not forced to take the first drink or to continue drinking, so, the result of this intoxication is not a psychosis or legal insanity. So, consequently, I feel that he was at least mostly able to distinguish right from wrong.

"Q Now, do you have an opinion, Doctor, assuming that on this day the defendant came home, obtained a gun, pointed it at a man, thereafter loaded it and returned and fired the gun, assuming those facts, along with the other facts that you know, would you have an opinion as to whether this type of person would know the nature and quality of the act of loading the gun and pulling the trigger?

"A Well, it seems to me he did."

Marilyn Fleenor testified in regard to defendant's actions:

"He came in and he says, 'Don't mess with me, old man. I will kill you if you do.' Or it was in the other order, different, I remember, but he said that.

\* \* \* \* \* \*

"I saw my stepfather go to the desk and put a quart of beer down \* \* \* he walked into the bedroom \* \* \* and he got the gun out of the bottom dresser drawer. \* \* \*"

She also testified that she heard sounds as if some one were loading a gun; that the deceased was using a crutch at the time the shot was fired; and that the gun was pointed toward the grandfather's head. On cross-examination, Marilyn again testified that defendant said:

"Don't mess with me. I'll kill you, if you do."

Marilyn also admitted writing (forty minutes after the shooting) the following statement:

"Grandpa told Cliff [defendant] to put the gun away and stop acting like a fool. He told Cliff to go drink his beer and to behave himself."

She stated that the deceased had done nothing to make defendant angry when the father first walked in the door. It was about twenty minutes from the time defendant arrived home until the shot was fired, that it looked as though the deceased was armed with an ax and also with a crutch, that defendant had an easy escape into the next room if he had desired to do so.

Counsel for defendant states the trial court's ruling was in direct contradiction to the holding in State v. Schantz, supra, wherein we said:

"\* \* \* where the trial judge has a conscientious conviction that all the elements of an offense have not been established beyond a reasonable doubt \* \* \* he has not only the right but the duty to direct a verdict \* \* \*."

It is the contention of counsel that had the court followed this principle of law it would

have instructed a verdict for defendant. The answer to this is that the court evidently did not have such a conscientious conviction, or it would have given an instructed verdict.

We are unable to say that there was not substantial evidence from which the jury could find defendant guilty of murder, and therefore hold that the motion for a directed verdict was properly denied. State v. Cano, supra.

■ Counsel for defendant next states the court erred in denying defendant's motion for separate trials on the pleas of not guilty and of not guilty by reason of insanity. In 1968 Arizona added A.R.S. § 13–1621.01 which dictates a separation of these two issues when the defense of insanity is properly raised. However, it was not the law at the time this motion was made, and we conclude it is not controlling in the instant case.

Counsel for defendant further states that Dr. Saravia, in testifying for the State, inadvertently stated that defendant related on one occasion, while under the influence of alcohol, he had chased his wife with a gun, and on another occasion tried to choke her. He states that this remark might have been avoided had the trials been separated. Counsel evidently did not think that it was too prejudicial to his client at the time, as he made no objection, nor did he ask for an instruction for the jury to disregard it. We have held that a psychiatrist should be allowed to relate what matters he necessarily considers "case history" as a basis for reaching his conclusion. State v. Griffin, 99 Ariz. 43, 406 P.2d 397.

In the instant case there was much evidence admitted which could just as easily have been considered as beneficial to defendant, such as the story of defendant's life told by the doctors as related to them, which would ordinarily cause sympathy for defendant.

According to what defendant told the doctors, defendant had been an alcoholic for a large portion of his life, and his

drinking was caused largely by the insistence of his father. Under these circumstances, a jury would understand that this evidence was for the purpose of determining his mental condition, and, when coupled with the other stories of his life, we do not feel that its admission was prejudicial to him. We therefore hold that the failure of the court to bifurcate the trial was not prejudicial error.

■ Defendant next contends that the exclusion from the jury for cause rather than by peremptory challenge of all persons who objected to the death penalty denied him constitutional rights. Four potential jurors out of a total of forty-five were eliminated because of their objection to the death penalty. Counsel for defendant claims that even though the death penalty was not imposed, this practice of excluding these jurors stacks juries with "prosecution prone" jurors who are necessarily biased on finding "guilt." Defendant claims this is sufficient to violate "due process" under the Sixth Amendment made applicable to the States through the Fourteenth Amendment, United States Constitution.

In State v. Madden, 104 Ariz. 111, 449 P.2d 39, we relied on the case of Bumper v. North Carolina, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797. The Bumper opinion discussed the now famous Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776, which held that where the trial court allows a systematic exclusion of jurors opposed to the death penalty the sentence of death is unconstitutional because it did not come from an impartial jury. Bumper held Witherspoon does not apply, even where those opposed to the death penalty are excluded, when the death penalty is not invoked. The allegation that they are impartial because they will be "prosecution prone" is not maintainable. Therefore, we conclude the exclusion of the jurors on this ground was not error.

■ Counsel for defendant next contends that the court erred in failing to instruct the jury on involuntary manslaughter. The court instructed the jury on voluntary manslaughter. In a homicide case, it is the duty of the trial judge to instruct the jury on every grade of offense the evidence tends to show defendant guilty of, and conversely, refuse to instruct as to other grades of the offense, of which the evidence shows he could not be guilty. Antone v. State, 49 Ariz. 168, 65 P.2d 646; Miranda v. State, 42 Ariz. 358, 26 P.2d 241.

Involuntary manslaughter as distinguished from voluntary manslaughter contemplates an act committed *un*intentionally rather than intentionally. State v. Madden supra; State v. Foggy, 101 Ariz. 459, 420 P.2d 934; Harding v. State, 26 Ariz. 334, 225 P. 482. The evidence shows an intentional act, rather than an unintentional act. As a matter of fact, one of the defenses of defendant was self-defense. In State v. Foggy, supra, we said:

> "The defendant maintains that the jury should have been instructed as to the elements of the crime of involuntary manslaughter. Involuntary manslaughter, as distinguished from voluntary manslaughter, contemplates an act committed unintentionally. Harding v. State, 26 Ariz. 334, 225 P. 482. An intentional use of a deadly weapon, however, is enough to infer an intent to cause serious bodily harm to the decedent. State v. Preis, 89 Ariz. 336, 362 P.2d 660. This inference, in addition to the fact that there is nothing in the record to indicate that the defendant shot other than intentionally substantiate the trial court's refusal to grant an instruction on involuntary manslaughter. See State v. Douglas, 2 Ariz. App. 178, 407 P.2d 117."

Accordingly, we hold that the refusal to instruct on involuntary manslaughter was not error.

■ Counsel for defendant next contends that prejudicial error was committed by the trial judge as a result of his rulings on matters of evidence during the course

of the trial. He states that the comment of the deputy county attorney that

"The defendant went into his bedroom and obtained a .357 magnum which is one of the largest guns you can get and blow a man apart * * *,"

was prejudicial, and that the court erred in overruling his objection to the same. The object of an opening statement is to apprise the jury of what the party expects to prove and prepare the jurors' minds for the evidence which is to be heard. Also, the extent to which counsel is permitted to go in making his statement is within the discretion of the court. The rule of the court will only be disturbed when this discretion is abused. Turley v. State, 48 Ariz. 61, 59 P.2d 312; State v. Burruell, 98 Ariz. 37, 401 P.2d 733.

The statement in regard to the size of the gun could not have prejudiced the jury because the gun itself was introduced in evidence, and the jurors had the opportunity of observing its size for themselves. The size of the gun had nothing to do with self-defense. We, therefore, hold that the court did not abuse its discretion in denying the objection.

 Counsel also contends the court erred in not permitting the jury to view the premises of the alleged incident, stating that the size of the rooms, the floor plan of the home, and the total size of the home was of vital importance and material to the case. This, too, is a matter within the discretion of the trial court. Duke v. State, 49 Ariz. 93, 64 P.2d 1033; Commonwealth v. Sallade, 374 Pa. 429, 97 A.2d 528; and State v. Nutley, 24 Wis.2d 527, 129 N.W.2d 155.

The principal defense in the instant case was that of insanity and self-defense. We do not agree with counsel that a view of the premises would have been of material assistance in supporting these defenses. The trial court, therefore, did not abuse its discretion in denying defendant's request to view the premises.

 Counsel also contends the court erred in permitting certain testimony given by Officer Robert G. Manning in regard to opinion evidence of the sanity of defendant. Officer Manning testified in regard to certain statements and conduct of defendant in his presence shortly after the commission of the crime, and based his opinion of defendant's sanity upon defendant's conduct at the time. The basis for the opposition was that the opinions were based partly upon evidence which had been suppressed by the court. The officer was permitted to testify that he had a conversation with defendant, but did not relate the conversation; that he had occasion to observe the physical reactions and appearance of defendant at that time; that he had an opportunity to observe his face, his eyes, and his mannerisms; that, based upon this, he gave his opinion that defendant was not "what you would call drunk"; that it was obvious he had been drinking, and was hard to talk to, and did not answer directly to a question; that he would, however, answer and make some other form of statement; also that, based upon his observations, he would not say that defendant was insane.

 There is great latitude in regard to admission of evidence as a basis for opinion evidence of insanity. State v. Martin, 102 Ariz. 142, 426 P.2d 639; State v. Griffin, supra; State v. Gilmore, 242 Or. 463, 410 P.2d 240.

 The same rule applies to cross-examination of Dr. Ruland by the State during which the county attorney read a report of Dr. Ruland's to the court under Rule 250 in regard to whether defendant was insane or mentally defective to the extent that he was unable to understand the proceedings against him or assist in his defense. Under the circumstances of this case, where defense counsel was allowed extended inquiry into defendant's mental state, and where the direct examination of defendant's psychiatric expert elicited an unequivocal opinion as to defendant's mental condition, we conclude that it was not error for the trial court to permit the introduction of the report as evidence which

related to his mental ability to assist in his trial. State v. Gilmore, supra.

■ Counsel for defendant also assigns as error the sustaining by the court of an objection to a question in the direct examination of Dr. Ruland, the pertinent parts thereof being as follows:

"Q Have you rendered professional services to any one else in the family?

"A As I mentioned before, oh, beginning perhaps in July or August, I have seen Mr. Prewitt's stepdaughter on several occasions.

"Q What stepdaughter is this?

"A Marilyn Fleenor, Marilyn Fleenor.

"Q During these times that you rendered services to Marilyn Fleenor, did you form an opinion as to her mental condition?

"MR. WILKINSON: Your Honor, I am going to object. That is immaterial and irrelevant at this time.

"THE COURT: The objection is well-taken."

It was the contention of counsel that this evidence went to the competency of the witness Marilyn Fleenor, defendant's stepdaughter. If counsel for defendant desired to question this girl's competency, he should have raised an objection and examined her in that regard preliminarily so that the court could have intelligently decided the question of her competency. Hadley v. State, 25 Ariz. 23, 212 P. 458.

"* * * when the witness is first called to the stand to testify, the opponent must then challenge his competency, if grounds of challenge are then known to him. If not then known, and the cause for disqualification is disclosed in the testimony, the challenge may then be made." McCormick, Evidence, at 149-150

A thorough cross-examination of Marilyn by defense counsel, appearing on more than sixty pages of the reporter's transcript, was conducted, and no objection was made to the competency of Marilyn at the trial. In Commonwealth v. McKinley (1956), 181 Pa.Super. 610, 123 A.2d 735, 737, the Pennsylvania Court said:

"* * * 'If a party is in doubt as to the competency of a witness, he should examine him in that regard, and the court should make a determination thereon preliminarily when the witness is produced. * * * It is the privilege and right of the objector to have the witness examined on his voir dire before he is sworn.' 3 Wharton's Criminal Evidence § 740. At no time during the trial was there any objection raised as to the competency of the child witness. Moreover, counsel for the defendant subjected the witness to a searching cross-examination. Such cross-examination, coupled with the failure to object at any time during the trial, constitutes a waiver of objection as to the competency of this witness."

The rule defining the time for objection to qualification of a witness is stated in Wigmore on Evidence, 3d Ed., § 486, as follows:

"* * * the opponent [must] * * * make objection and offer proof before the testimony of the witness is begun,—so far at least as the opponent then is aware of any specific ground of objection. * * *"

No objection having been made to the competency of Marilyn to testify, the court did not err in sustaining the objection.

Judgment affirmed.

UDALL, C. J., LOCKWOOD, V. C. J., and STRUCKMEYER, J., and Francis J. DONOFRIO, Judge, Court of Appeals, Division I, concur.

The Honorable JACK D. H. HAYS, did not participate in the determination of this opinion.